**IOWA NETWORK SERVICES, INC., Plaintiff,**

v.

**QWEST CORPORATION, Defendant.**

**No. 4:02 CV 40156.**

United States District Court,
S.D. Iowa,
Central Division.

Aug. 17, 2005.

James H. Lister, Matthew R. A. Heiman, Sean F. Murphy, McGuire Woods LLP, McLean, VA, James Urquhart Troup, McGuire Woods LLP, Washington, DC, Lawrence P. McLellan, Michael P. Joynt, Sullivan & Ward, PC, Des Moines, IA, for Plaintiff.

Bobbee Joan Musgrave, Steven James Perfrement, Musgrave & Theis LLP, Joseph V. Hatala, Qwest Corporation, Roy E. Hoffinger, Perkins Coie LLP, Denver, CO, David S. Sather, Sheila K. Tipton, Amy M.

Omvig, Dorsey & Whitney LLP, Des Moines, IA, for Defendant.

## ORDER ON INITIAL BRIEFS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This action is presently before the Court on the initial briefing of the parties (Clerk's Nos. 50, 54) filed pursuant to this Court's July 6, 2004, scheduling order. Qwest chose to pursue summary judgment as part of this process, and therefore the Court will analyze the parties' arguments under the summary judgment standard. Attorneys for Plaintiff are Lawrence P. McLellan, James U. Troup, Tony S. Lee, James H. Lister, and David E. Lampp; attorneys for Defendant are Sheila K. Tipton, Dennis W. Johnson, Amy M. Omvig, and Roy E. Hoffinger. The parties did not request a hearing, and the Court finds a hearing is not necessary. Accordingly, the Court considers the issues presented in the initial briefings and in Qwest's motion for summary judgment to be fully submitted and ready for ruling.

## TABLE OF CONTENTS

PROCEDURAL HISTORY............................................................854

BACKGROUND FACTS............................................................854
 A. Preliminary Statement...............................................854
 B. Plaintiff's Action.....................................................855
 C. Telecommunications in Iowa.........................................856
 D. The Telecommunications Act and FCC Implementing Decisions................858
 E. Decisions of the IUB.................................................861
 F. INS' Tariffs.........................................................863
 G. The Present Action...................................................864

ANALYSIS....................................................................864
 A. Standard for Summary Judgment.....................................865
 B. Compensation Sought...............................................865
 C. The Parties and the Traffic at Issue.................................866
 1. Type of Traffic.................................................866
 a. "Local" versus "Long Distance" Traffic.....................866
 b. IntraMTA Versus InterMTA and Wireless Versus Wireline............870
 2. Regulatory Classification of Parties.............................871
 a. INS..................................................871
 D. Reciprocal Compensation and Access Charges.........................876
 1. Access Charges and Tariffs.....................................876
 2. Applicability of Reciprocal Compensation Rules...................878
 a. Transiting Carriers.....................................878
 b. Intermediary Carriers and the *Further NPRM*................887
 3. Negotiation and Arbitration and Section 252 Exclusivity............890
 4. IXC Exception.................................................893
 5. Commingling...................................................893
 6. Billing Information.............................................894
 E. Tariffs..............................................................894
 1. Tariffs in General..............................................895
 2. Tariffs Involved................................................895
 3. Tariffs as Appropriate Method to Seek Compensation.............897
 4. The FCC's Recent *T–Mobile Wireless Termination Order*.........900
 F. The Self-help Claim.................................................902
 G. Unjust Enrichment.................................................904
 H. Implied Contract/quantum Meruit Claim..............................909

CONCLUSION ................................................................916

## PROCEDURAL HISTORY

Plaintiff Iowa Network Services, Inc. ("INS"), initiated the present action against Defendant Qwest Corporation ("Qwest") by filing a Complaint and Demand for Jury Trial with this Court on March 27, 2002. Qwest successfully moved to dismiss,[1] only to have the Eighth Circuit, in a ruling dated April 7, 2004, reverse the dismissal and remand for further proceedings.[2] On December 2, 2004, this Court filed an Order on Pending Motions (Clerk's No. 82), granting Plaintiff's Motion to Amend and determining the Court's review was not limited to "judicial review" of an agency decision, "as INS' Complaint is an original action and not an appeal of the administrative agency decision requiring a deferential judicial review of that decision," and as a result, the record is not limited to the administrative record. Order on Pending Motions at 31, 36–37. The parties subsequently filed the pending briefs/motions in order to clarify and narrow the issues for trial.

In a somewhat convoluted briefing plan, both parties filed initial briefs on August 11, 2004, with Qwest's brief being a motion for summary judgment. The parties were then given opportunity to resist/respond to the opposing parties' brief, and again to reply to the filed response/resistance. After this Court granted Plaintiff's Motion to Amend in the Court's Order on Pending Motions, the Court allowed the parties additional opportunity to "provide the Court with any necessary supplement to their prior briefing ... [with t]hese briefs ... limited to the new issues raised in the Amended Complaint, i.e., the self-help and quantum meruit counts." Order on Pending Motions at 13. The parties completed this briefing, including responses, on December 27, 2004. The Court then took the matter under advisement, accepting notice of supplemental authority, including responses, on two occasions in March, 2005. The Court now considers the matter fully submitted.

The purpose of this initial briefing was to allow the Court to become aware of the issues and rule on any initial matters, thereby narrowing the focus of the case and clarifying the issues as the action proceeds toward trial. Because Qwest chose to pursue summary judgment as part of this process, the Court will analyze the parties' contentions under the summary judgment standard as set out below.

## BACKGROUND FACTS

### A. Preliminary Statement

This case concerns intercarrier compensation for telephone calls ("traffic") placed by customers of third-party commercial mobile radio service ("CMRS") providers (i.e., "wireless carriers")[3] to end-user customers served by third-party Incumbent Local Exchange Carriers ("ILECs")[4] located in the same calling area.[5] The calls

---

1. *See Iowa Network Services, Inc. v. Qwest Corp.*, 2002 WL 31296324 (S.D.Iowa Oct.9, 2002) (hereinafter *"INS v. Qwest I "*).

2. *See Iowa Network Services, Inc. v. Qwest Corp.*, 363 F.3d 683 (8th Cir.2004) (hereinafter *"INS v. Qwest II "*).

3. In the telecommunications industry, wireless carriers are called Commercial Mobile Radio Service or "CMRS" providers who essentially offer one-way or two-way radio communication services between land stations and mobile receivers. *See* 47 C.F.R. § 20.3.

4. *See* 47 U.S.C. § 251(h)(1) (defining an incumbent local exchange carrier to mean with respect to a given area, the local exchange carrier that "on the date of enactment of the Telecommunications Act of 1996, provided telephone exchange service in that area").

5. Whether this traffic is "local" or "long distance" is an issue resolved by the Board and attacked by INS in this action.

at issue are (1) placed (i.e., "originated") by end-user customers of third-party CMRS wireless carriers, (2) delivered by the wireless carriers to Qwest as an intermediate, or transiting, carrier, (3) transported approximately six blocks by Qwest and delivered to INS, a second intermediate, or transiting, carrier, (4) transported by INS to the ILECs serving the called parties, and (5) routed and delivered (i.e., "terminated") by the ILECs to the premises of the called parties, the ILECs' end-user customers. Qwest and INS are involved in the transport of these calls because the originating third-party wireless carriers and the terminating ILECs have elected to "interconnect" their networks "indirectly" to permit calls between their end-user customers.[6]

## B. Plaintiff's Action

In its Amended Complaint before this Court, INS states, "This is a collection action to recover unpaid charges for telecommunication services that Qwest has received and continues to receive while refusing to pay INS the lawful charges for these services." INS then seeks payment under both federal and Iowa tariffs or, in the alternative, for unjust enrichment and implied contract/quantum meruit. INS has also brought a claim for self-help in violation of the Communications Act. Further, as part of its action, INS alleges the Iowa Utilities Board ("IUB" or "the Board") issued a series of orders in docket number SPU–00–7 that violate federal law. Specifically, INS asserts the IUB misinterprets and misapplies various provisions of the Telecommunications Act, section 251 in particular. The Board's determinations that are being challenged include the following: (a) wireless calls that are placed and received by subscribers of different carriers located in the same major trading area ("MTA")[7] are classified as "local", and are not subject to long distance access charges, notwithstanding the fact that the originating and terminating carriers are interconnected indirectly through one or more additional carriers; (b) the termination of such calls is subject to the "reciprocal compensation" provisions of 47 U.S.C. § 251(b), as implemented through negotiated or arbitrated interconnection agreements between the originating and terminating carriers pursuant to 47 U.S.C. § 252; and (c) Qwest, which provides an indirect interconnection and transiting service between the CMRS provider and INS,

---

**6.** The term interconnection is used by regulators and carriers to refer to the physical linking and use of networks owned by different carriers to permit customers of one carrier to call customers of another carrier. Interconnection may be either direct or indirect. "Interconnection is direct when the carrier's facilities or equipment is attached to another carrier's facilities or equipment," and "indirect when the attachment occurs through the facilities or equipment of an additional carrier." Order on Reconsideration, *Deployment of Wireline Services Offering Advanced Telecommunications Capability,* 2000 WL 1128623, \*25 n. 198, 15 FCC Rcd. 17806, at ¶ 85 n. 198 (2000).

**7.** For wireless communications, the country is divided into Major Trading Areas ("MTAs") rather than local exchange areas. Thus, in the field of wireless telecommunications, the MTA is the local calling area for wireless telecommunication providers. *See* 47 C.F.R. § 51.701(b)(2), with MTAs determined pursuant to 47 C.F.R. § 24.202. "IntraMTA" wireless traffic originates and terminates in the same MTA. "InterMTA" wireless traffic originates in one MTA and terminates in another. "The determination of whether a call is interMTA or intraMTA is made when the call is first connected, although a wireless user may travel into another MTA during the duration of the call." *INS v. Qwest II,* 363 F.3d at 687 n. 2.

In Iowa, the MTA for wireless telecommunications is called the Des Moines MTA and encompasses nearly all of the State of Iowa, as well as small parts of neighboring states, including Michigan, Illinois, Missouri, Nebraska, and South Dakota.

is not responsible for payment to INS of access charges or other compensation for its transport or termination of calls placed by subscribers of the CMRS providers.

Qwest has countered that the Board's determinations do *not* violate federal law and must therefore be upheld and enforced by this Court. Qwest further contends INS cannot circumvent the result of the Board's determinations through unilaterally filing a federal tariff purporting to dictate and govern the rates, terms, and conditions of the parties' interconnection considering the Board ordered the parties to negotiate and, if necessary, arbitrate an interconnection agreement that would set forth and govern the rates, terms, and conditions of the parties' relationship. Qwest contends the amended federal tariff is unauthorized and further that neither the federal nor state tariffs are applicable to the traffic at issue.

## C. Telecommunications in Iowa

Due to the largely rural nature of Iowa, telecommunications service in much of the state has historically been provided by small independently owned companies located in and serving small designated geographic areas. These phone companies provide local telephone services, called "telephone exchange service", within a defined geographic area known as the local exchange. Providing such services made these local phone companies "local exchange carriers" ("LECs").[8] Iowa is served by approximately 147 small local phone companies ("Independent Local Exchange Carriers" or "Independent LECs") that provide local telephone service within specific geographic regions. These Independent LECs are generally located in the rural areas of the state and many, if not all, of these Iowa LECs were independently owned.

Qwest, formerly known as U.S. West Communications, is the former Regional Bell Operating Company in the State of Iowa. Qwest, which provides local telephone services to customers throughout a fourteen-state area, is also an LEC, though not independently owned and not functioning in such capacity with respect to the traffic at issue here. *See INS v. Qwest II*, 363 F.3d at 694 n. 3. While differing greatly in size, Qwest and the independent LECs provide basically identical services, though Qwest also offers long distance services.

Typically, LECs own the wires, computer switches, and other facilities necessary to provide telecommunications service to their subscribing customers. Access services or exchange services were available for purchase to competing carriers, thereby allowing purchasers to send or receive calls from a subscriber over the facilities owned and maintained by another LEC. The major benefit of purchasing access was that a company could reach specific phone customers by purchasing access to the LEC circuits without having to build facilities throughout an area served by another LEC.

In 1987, most of the independent LECs then in existence in Iowa joined together to form Iowa Network Services ("INS"). The major benefit of this formation was that calls placed to or from a customer served by one of the companies in INS could now utilize INS' network to reach whichever independent LEC the customer subscribed to through INS' one centralized network. As was customary, INS charged access fees to use its network. These fees were set forth in tariffs on file with the Federal Communications Commission ("FCC"), which governed INS' interstate services, and tariffs on file with the IUB,[9]

---

8. *See* 47 U.S.C. § 153(26) (defining "LEC" as any person that is engaged in the provision of telephone exchange service or exchange access).

9. The IUB is the board charged with governing telecommunications in Iowa, so far as it is granted the authority to do so.

which governed INS' intrastate services. Qwest is not a member of INS.

As long as telephone calls were placed from traditional land-based wire connected phones, the system of ordering access to the INS network detailed above seemingly worked well. Technology had an impact on the development and popularity of wireless cellular phones, however, and as the popularity of wireless phones grew, so too did issues and disputes surrounding the access services and charges associated with accessing the INS network, as "[t]raditional notions of 'local exchange areas' do not fit neatly into this new world of wireless communications." *INS v. Qwest II,* 363 F.3d at 687.

For wireless communications, the country is divided into Major Trading Areas (MTAs) rather than local exchange areas. Thus, the local calling area for a cell phone user is determined by the cell phone user's MTA. *See* 47 C.F.R. § 51.701(b)(2). The MTA for Iowa is the Des Moines MTA, which encompasses virtually all of Iowa and small portions of its neighboring states. IntraMTA traffic originates and terminates within the same MTA, while interMTA traffic originates in one MTA and terminates in another.[10]

Traditionally, when a call begins at a third-party wireless caller's phone, the call is connected by radio signal to the wireless service provider. The call then travels over the wireless carrier's network until it interconnects with Qwest's network/facilities. Initially, Qwest identified for INS the number and type of trunks[11] that Qwest would like INS to provide. Qwest's

requests for trunks from INS were set forth on written Access Service Requests ("ASRs"). Through these ASRs, Qwest ordered access trunks from INS. Qwest then negotiated with CMRS carriers to provide them with what it calls a "transit" service after the third-party CMRS provider's calls interconnect with Qwest's network. Qwest then transports the call from the subscriber of the CMRS wireless carrier on Qwest's network to a point of interconnection with INS. INS then carries the call over its trunks to a point of interconnection with the independent LEC network serving the person being called.

Qwest's network collects both wireline traffic and wireless traffic and directs this traffic to INS.[12] The wireline and wireless traffic coming from Qwest include both interstate and intrastate telephone calls. Qwest "commingles", or mixes together, this wireline and wireless traffic before transmitting it to INS. Because of the commingling of calls by Qwest, the identity of the wireless or other carrier originating each call cannot be readily determined by INS' equipment. Consequently, INS informed Qwest at the outset of this dispute in 1999, Qwest's commingling of calls makes it infeasible for INS to directly bill the wireless carriers, which originate calls for INS' transiting service.

In short, as relevant to the present action, Qwest delivers to the INS network wireless phone calls originated by customers of third-party CMRS carriers who are calling subscribers of independent local exchange carriers, and whose calls originate

---

10. The determination of whether a call is interMTA or intraMTA is made when the call is first connected, although a wireless user may travel into another MTA during the duration of the call.

11. A trunk is a transmission path connecting two switching systems used to establish an end-to-end connection.

12. Wireline traffic is the traditional communication method that uses wires or cables to transmit telephone calls. Wireless traffic is the use of cellular telephones and radio to transmit telephone calls.

and terminate in the same MTA. Until April 1999, Qwest paid the tariffed rates for taking the wireless-originated calls from non-Qwest customers and delivering them to the independent LECs via the INS network pursuant to either relevant INS intrastate tariffs filed with the IUB or INS interstate tariffs on file with the FCC.[13] Since then, Qwest has refused to pay INS, and now INS seeks compensation, both past and future, for transiting and terminating the calls Qwest delivers to the INS network.

## D. The Telecommunications Act and FCC Implementing Decisions

Congress enacted the Telecommunications Act ("the Act" or "the 1996 Act")[14] in February 1996, greatly amending the Communications Act of 1934. Prior to the Act, when a new company entered a geographic area, it routinely had to compete with an established LEC for customers in that particular service area.[15] The Act was intended to enhance competition in the market for local telephone service, see AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), because "[e]ven after the 1980s breakup of the AT & T telecommunications monopoly, which, inter alia, divested AT & T of its local exchange carriers, local telephone service continued to be viewed and operated as a natural monopoly, with state utility boards, or commissions, giving one local telephone service provider exclusive coverage of a given geographic area." INS v. Qwest II, 363 F.3d at 685. To break down barriers to competition in the local phone market, the Act requires all carriers to facilitate local competition by sharing existing networks and facilities with any new competitors. Id. at 685–86.

The Act "is a unique hybrid of statutory and common law that divides decision making authority between the Federal Communications Commission ("FCC"), State commissions, and private parties." Southwestern Bell Tel. Co. v. Connect Communications Corp., 72 F.Supp.2d 1043, 1044 (E.D.Ark.1999), rev'd on other grounds, 225 F.3d 942 (8th Cir.2000). The 1996 Act "thrust the federal government into the local telephone market regulatory arena, which has previously been the exclusive domain of the states." INS v. Qwest II, 363 F.3d at 686 (citing MCI Telecomm. Corp. v. Bell Atlantic–Pennsylvania, 271 F.3d at 497 ("The Act requires that local service, which has previously been operated as a monopoly overseen by the several states, be opened to competition according to standards established by federal law.")). In practice, the Act may be characterized as schizoid, not in the psychological sense, but for the fact that it allows under some circumstances for the co-existence of disparates. See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. at 397, 119 S.Ct. 721 ("It would be gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction. That is most unfortunate for a piece of legislation that profoundly affects a crucial segment of the economy worth tens of billions of dollars."). As the Eighth Circuit so presciently recognized, it is this "new relationship between

---

**13.** Qwest also paid termination fees to the ILEC terminating the call pursuant to the respective independent ILECs' tariffs.

**14.** See 47 U.S.C. §§ 151–615 (2001).

**15.** Prior to the 1996 Act, the FCC issued several decisions related to interconnection be-

tween wireless carriers and wireline local telephone companies (i.e., LECs) pursuant to section 201 of the Communications Act of 1934, 47 U.S.C. § 201. The pre–1996 Act landscape of telecommunications law is discussed further infra, at section D.1.

the federal government (through the ... FCC), the federal courts, and the state commissions in regulating local telephone markets and the competing providers of telephone services in those markets [that] is at the heart of this case." *INS v. Qwest II*, 363 F.3d at 686. The 1996 Act, subsequent determinations by the FCC, various cases resolved by United States District Courts, and indeed the briefs filed in this action, dramatically illustrate we labor in the early stages of a slow evolution.

This new structure governs the telecommunications companies doing business in Iowa. As a general matter, but not without exception, the FCC regulates interstate telephone service, while the IUB oversees intrastate service. *Compare* 47 U.S.C. § 152 (2002) (defining FCC's jurisdiction); *see also* 47 U.S.C. §§ 201–205 (indicating that the FCC has jurisdiction over interstate communication), *with* 47 U.S.C. § 253(b) (relating to State regulatory authority and discussing that nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, and ensure the continued quality of telecommunications services); *see also* 47 U.S.C. § 261(b)-(c) (indicating Congressional intent with respect to existing and additional state requirements that "nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services ... as long as the State's requirements are not inconsistent with this part or the [FCC's] regulations").

Pursuant to this regulatory framework, INS, as a common carrier of telephone services, must file tariffs with the FCC, setting forth a schedule of charges for the various interstate services it provides. *See* 47 U.S.C. § 203. For services provided in the state of Iowa, the IUB regulates the telecommunications industry and other public utilities through tariffs, or regulations of utility rates and services. *See Teleconnect Co. v. U.S. West Communications, Inc.*, 508 N.W.2d 644, 646 (Iowa 1993); *see also* Iowa Code § 476.1 (delegating to the utilities board the authority to "regulate the rates and services of public utilities"). Every public utility doing business in Iowa, including INS, must "file with the board tariffs showing the rates and charges for its public utility services" under this regulatory scheme, and every public utility "shall keep copies of its tariffs open to public inspection under such rules as the board may prescribe". *Id.* (citing Iowa Code § 476.4). Based on this structure, the Iowa Legislature implemented various rules and definitions found in the Iowa Administrative Code to guide the Board in regulating the telecommunications industry in Iowa. *See,* 199 Iowa Adm.Code 38.1(1).

To achieve the purposes of promoting and fostering competition, the 1996 Act required all carriers "interconnect, directly or indirectly," with other carriers. 47 U.S.C. § 251(a)(1). The Act also espoused interconnection agreements, requiring ILECs to agree, upon request, to provide interconnection to a competing carrier pursuant to the interconnection agreement approved by a state public utility commission rather than pursuant to a tariff. *See* 47 U.S.C. §§ 251(c)(1) and 252. The Act further imposes a duty on all LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications" consisting of local traffic. *See* 47 U.S.C. § 251(b)(5).

Thus, the Act's goal of fostering competition is furthered by allowing carriers to compete with ILECs by utilizing the ILECs' telecommunications networks, rather than forcing the competing carriers to build their own networks before serving a given area. The originating and

**860**

terminating parties are then compensated according to the roles they play in the transport and termination of the traffic as provided in the interconnection agreement between the parties.

Due to the complexity of the Telecommunications Act, the FCC created an order directing the implementation of the Act. *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Interconnection between Local Carriers and Commercial Mobile Radio Service Providers, First Report and Order,* 1996 WL 452885, at *302–305, 11 FCC Rcd. 15499, at ¶¶ 1035–1045 (1996) (hereinafter *"Local Competition Order"*). "The order was in response to the 1996 Act's direction to the FCC to "establish regulations to implement the requirements' of § 251, that is, the requirements to advance local competition." " *INS v. Qwest II,* 363 F.3d at 687 (quoting *GTE South, Inc. v. Morrison,* 199 F.3d 733, 737 (4th Cir.1999) (quoting 47 U.S.C. § 251(d)(1))).

In the *Local Competition Order,* the FCC addressed the applicability of the 1996 Act to particular types of calls (including calls originated by end-user customers of CMRS providers), of the Act's provisions regarding "transport"[16] and "termination", and the formation of interconnection agreements. *Local Competition Order,* at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. Relevant to this case, the *Local Competition Order* specifically addressed the billing of calls that a wireless carrier delivers to an LEC for termination, where the call both originates and terminates in a geographic area, i.e., the Major Trading Area. *See id.*

On appeal from an earlier decision in this case, the Eighth Circuit observed the following regarding the conclusions of the *Local Competition Order:*

> The FCC decreed that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5) [requiring LECs to establish reciprocal compensation arrangements], rather than interstate and intrastate access charges." [*Local Competition Order*, at *302, 11 FCC Rcd.] at ¶ 1036. The FCC also found that "the reciprocal compensation provisions of section 251(b)(5) for transport and termination of traffic do not apply to the transport or termination of interstate or intrastate interexchange traffic." *Id.* *301, 11 F.C.C.R. ¶ 1034. "Interexchange traffic" is a term of art which correlates to what consumers would traditionally consider to be "long-distance" telephone service for which "toll charges" are incurred; an interexchange carrier (IXC) is a long-distance carrier who provides intrastate or interstate long-distance communications services between local exchange areas.

*INS v. Qwest II,* 363 F.3d at 687–88.

In early 1999, Qwest stopped paying access charges to INS for the intraMTA wireless traffic of third parties that Qwest delivered to the independent LECs via the INS network based on the FCC determinations made in the *Local Competition Order.* Qwest contends the FCC determined that traffic between an LEC and a CMRS provider which at the beginning of the call originates and terminates within the same MTA is local traffic and there-

---

**16.** In its discussion of "transport", the FCC noted that "[m]any alternative arrangements exist for the provision of transport between the two networks," and that these arrangements include "dedicated circuits provided either by the incumbent ILEC, the other local service provider, separately by each, or jointly by both," and "facilities provided by alternative carriers." *Local Competition Order,* at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046.

fore not subject to access charges. *See Local Competition Order,* at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046.

## E. Decisions of the IUB

As delineated above, this case involves the manner telephone traffic is exchanged by small local rural telephone companies, also known as independent or rural ILECs,[17] and wireless telephone companies through the telephone network owned and operated by Qwest. In April 1999, Qwest advised INS and the terminating ILECs that, as a transiting carrier, it was not responsible for paying "access" charges or other compensation for their transport and termination of calls placed by customers of third-party CMRS providers. INS and the terminating ILECs disagreed with Qwest's position.

Consequently, on May 19, 2000, Qwest filed a petition with the IUB for a declaratory order regarding the exchange of local traffic between cellular telephone companies and other local service providers using Qwest's facilities. The Board docketed the petition as a formal contested case proceeding pursuant to Iowa Code §§ 17A.12 and 476.3, and identified as Docket No. SPU–00–7.[18] The Board granted motions to intervene filed by INS, the Rural Iowa Independent Telephone Association ("RIITA"), the Iowa Telephone Association ("ITA"),[19] several Iowa independent ILECs, and several CMRS providers.[20]

All parties involved in the IUB action had a chance to file initial briefs and reply briefs, and the Board held a "technical workshop". Hearings presided over by all three Board members lasted several days and concluded on April 19, 2001. On November 26, 2001, the IUB issued a Pro-

---

**17.** Qwest is also an ILEC but is not a independent or rural and thus not a "rural ILEC." *See INS v. Qwest II,* 363 F.3d 683, 694 n. 3 (8th Cir.2004) ("Although Qwest serves as a LEC in certain communities to the extent it provides local telephone service, and may even be an ILEC, ... it served neither function with respect to the traffic here at issue. The CMRS traffic was not directed to any of Qwest's local telephone customers; rather, Qwest served merely as an intermediary carrying the traffic on its route to INS's member companies' local telephone customers."). There is also no evidence that INS is a rural ILEC under the definitions found in the 1996 Act. Indeed, this issue was not presented to the Board in the underlying hearings of this dispute.

**18.** Qwest's petition was based on the FCC determinations made in its *Local Competition Order.* After examining Qwest's request, the IUB found numerous facts to be in dispute and also found that "broad" issues regarding the proper treatment of "transit traffic" or traffic carried by intermediary carriers existed. As a result, the IUB refused to issue Qwest a declaratory order.

Instead, on June 23, 2000, the IUB opened Docket No. SPU–00–7 to address specific issues dealing with transit traffic and related

issues. INS was allowed to intervene; thus, INS, Qwest, RIITA, and others became parties to the action before the Board. According to the IUB, this proceeding was to provide for a full and complete record since the proceeding would establish certain policies regarding transit traffic that could impact the entire telecommunications industry in Iowa.

**19.** Both RIITA and ITA are trade associations of Iowa LECs. As briefly noted earlier, RIITA has brought its own suit against the IUB.

**20.** In addition to the declaratory ruling, Qwest also sought a refund of access charges it paid to INS for the 24–month period prior to April 1999. In turn, INS sought payment of the access charges Qwest refused to pay after April 1999. Ultimately, the Board declined to order a refund to Qwest, because it determined the parties had agreed to the rates previously charged at least until Qwest formally disputed them. The Board's decision did, however, provide that compensation for the use of INS' facilities should apply prospectively from April 1999 and should be included in the negotiations for interconnection agreements.

posed Decision and Order (hereinafter *"IUB Proposed Decision and Order"*).

Briefly, the Board's decision concerns telephone traffic between a cellular telephone customer and a customer of an independent telephone company. Prior to the decision of the Board, if the cellular customer placed a call to a customer of an independent telephone company, the cellular companies delivered the call to Qwest. Qwest then transported the traffic to INS, a centralized equal access service provider. INS then carried the call to the independent telephone company for connection to the called customer. Qwest charged the wireless companies a transit fee for carrying the traffic. INS charged an access service fee to Qwest for carrying the traffic. The independent telephone company then assessed access charges to Qwest for terminating the call.

In the proposed decision and order issued November 26, 2001, by the IUB, the Board's Presiding Officer found that the cellular traffic at issue is local and that access charges do not apply to such traffic. This decision was made pursuant to the Board's understanding of orders issued by the FCC. The IUB held cellular carriers are entitled to interconnect directly with the independent carriers on a bill-and-keep[21] basis pursuant to Board and FCC rules. The decision further found Qwest is entitled to compensation for carrying the

traffic but has no obligation to pay access or other terminating fees. The Board also concluded that the CMRS wireless carriers could use INS facilities for an indirect connection to the independent companies, but that INS is entitled to compensation for providing those services. The Board found it could not determine the appropriate rate for INS' services on the record before it. As a result, the Board directed the parties to negotiate an interconnection agreement regarding these matters pursuant to the Telecommunications Act.[22] Board arbitration was available to resolve any issues the parties were unable to resolve by negotiation.

Some of the parties appealed the proposed decision to the Board. The Board affirmed the proposed decision by order issued March 18, 2002 (hereinafter *"IUB Order Affirming Proposed Decision"*), thereby making the Board's decision final. One party, ITA, filed an application for rehearing, which the Board denied by order issued May 3, 2002 (hereinafter *"IUB Order Denying Rehearing"*). Another party, RIITA, then sought judicial review of the Board's decision in the Polk County District Court (Iowa) pursuant to Iowa Code § 17A.19 but never served the petition on the Board. RIITA voluntarily dismissed that action on June 21, 2002, and subsequently brought filed a complaint in this Court, and that action has proceeded

---

**21.** " '[B]ill-and-keep arrangements are those in which neither of the two interconnecting carriers charges the other for the termination of telecommunications traffic that originates on the other carrier's network,' 47 C.F.R. § 51.713(a), and are appropriate when 'the amount of telecommunications traffic from one network to the other is roughly balanced with the amount of telecommunications traffic flowing in the opposite direction,' *id.* § 51.713(b)." *INS v. Qwest II*, 363 F.3d at 688.

**22.** The Eighth Circuit characterized the Board's action in the following manner:

The IUB, *in a directive short of an order,* strongly 'encouraged' the parties involved to resolve the dispute through negotiations conducted under 47 U.S.C. § 252(a) by reaching an interconnection agreement permitting reciprocal compensation, and if the negotiations proved unsuccessful, through an arbitrated agreement arranged by the Board pursuant to § 252(b).

*Rural Iowa Indep. Tel. Ass'n v. Iowa Utils. Bd.,* 362 F.3d 1027, 1029 (8th Cir.2004) (emphasis added).

concurrently with the present action brought by INS. INS also opted not to appeal the final Board decision in the Iowa state courts, *see* Iowa Code §§ 476.13, 17A.19, or bring an action challenging the Board's decision in federal court (like RII-TA). Instead, INS brought the present "rather ordinary collection action," *INS v. Qwest II,* 363 F.3d at 689, in this Court.

Despite this being a "rather ordinary collection action", the determinations of the IUB play a pivotal role. Relevant to the present action, the Board made the following determinations in its rulings:

- Under the FCC's orders, intraMTA traffic is classified as "local" and not subject to long distance "access" charges (*IUB Proposed Decision,* at 13, 21; *IUB Order Affirming Proposed Decision,* at 2);

- With regard to the traffic at issue, Qwest is not acting as an "IXC" providing "long distance" service to end users with whom it has a billing relationship, but is providing an indirect connection for local traffic (*IUB Proposed Decision,* at 13); accordingly, Qwest "has no obligation to pay access or other termination fees" (*IUB Order Affirming Proposed Decision,* at 2);

- When Qwest refused in 1999 to continue paying access charges for traffic originated by third-party CMRS providers, it put INS and the terminating ILECs "on notice that it no longer believed it was ordering" access services (*IUB Proposed Decision,* at 37–38);

- Rates and other terms applicable to such arrangements, including proposals that transit and other traffic should be delivered over "separate" trunks, and "the means by which interMTA [i.e., long distance] calls should be dis-

tinguished [from] intraMTA [i.e., local] calls" are "good examples" of the kinds of issues that can best be addressed through the Act's negotiation and arbitration process (*IUB Proposed Decision,* at 30; *IUB Order Affirming Proposed Decision,* at 20); [23]

- The results of the negotiations (and arbitrations, if necessary) would relate back to April 1999 (*IUB Proposed Decision,* at 38).

These issues, while not directly challenged in the present case (unlike the separate but related action filed by RIITA against the IUB directly challenging the Board's determinations), are relevant and potentially dispositive to the outcome of this case.

Prior to engaging in an analysis of the issues presented to the Court by the parties, the Court finds the IUB exercised the proper authority in rendering the decisions associated with Docket No. SPU–00–7. While these rulings are not preclusive, *see INS v. Qwest II,* 363 F.3d at 693 (holding "the district court erred in giving preclusive effect to the IUB's determination"), the Court finds the Board's determinations extremely persuasive given the Board's province and experience resides in regulation of the telecommunications industry. Consequently, the Court gives respectful consideration to the Board's determinations so far as the Board was acting within its authority and its decisions conform with federal law.

## F. INS' Tariffs

While the IUB determinations are important but corollary issues in the present action, this Court must ultimately "decide for itself whether the traffic at issue is subject to access charges pursuant to INS's tariffs." *INS v. Qwest II,* 363 F.3d

---

**23.** The Board also held that transiting carriers used by CMRS providers or ILECs to exchange traffic should be parties to the nego- tiations and Board arbitrations. *IUB Proposed Decision,* at 33.

at 695. At issue are three tariffs filed by INS.

The rates, terms, and conditions governing INS' access services for interstate wireline calls are set forth in a tariff INS filed with the FCC, known as Tariff F.C.C. No. 1 ("FCC Tariff"). The FCC Tariff has governed the INS–Qwest relationship with respect to interstate wireline calls from its inception on April 26, 1989, and, INS argues, continues to do so.

The FCC Tariff was amended on November 11, 2000 ("Amended FCC Tariff"). The rates, terms, and conditions governing INS' access services from November 11, 2000, to the present for both interstate and intrastate calls placed by a CMRS subscriber are set forth in the Amended FCC Tariff.

The rates, terms, and conditions governing INS' access services for non-wireless or wireline intrastate calls are set forth in a tariff filed with the Iowa Utilities Board, known as Iowa Tariff No. 1 ("Iowa Tariff"). The rates, terms and conditions governing INS' access service billed to Qwest before November 11, 2000, for intrastate wireless calls are also set forth in the Iowa Tariff.

According to INS, the rates, terms, and conditions in the FCC Tariff, the Amended FCC Tariff, and the Iowa Tariff are binding on Qwest. As tariffs approved by the appropriate regulators, the FCC Tariff, the Amended FCC Tariff, and the Iowa Tariff have the force and effect of law and are not ordinary contracts.

## G. The Present Action

In a previous ruling, this Court held the following with respect to the scope of review in this case:

The Court concludes the evidence in this case should not be limited to the administrative agency record. INS did file an action seeking enforcement of its tariffs, an original action it is entitled to bring

and have heard *de novo,* especially considering the Board did not even deal with the tariff issue in its proceedings. Moreover, there are other claims in the INS Complaint that also warrant a trial *de novo.* As evidenced by INS' list of open issues, there are many factual and legal determinations before this Court that were not before the Board. The Eighth Circuit, in finding the Board's determinations do not have a preclusive effect on this Court, has ordered this Court to "decide for itself" the issues in this case. This Court will be limited in its ability to do this, based on the issues in the present action, if the Court is constrained to consider only the material in the Board's administrative record.

In short, while the ultimate validity of the IUB decision is central to the matters now before this Court, the present action involves much more than a judicial review of the IUB's decision. It is not merely an appeal clothed as an original action even though the Court may be required to review certain aspects of the Board's decision. Accordingly, the Court will deny Qwest's motion to limit the Court's review to the administrative record of the IUB.

*Order on Pending Motion,* at 31. Accordingly, the Court must look to and analyze the decisions of the IUB as it relates to the tariff claims brought by INS. In so doing, the Court must analyze whether the decisions of the IUB violate federal law, and whether INS' tariffs are valid and binding on the traffic at issue.

## ANALYSIS

Review and consideration of the issues in this case involves an unresolved area of the law, complicated legal issues and arguments that dwell substantially on interpretation of and extrapolation on the 1996 Act, as well as prior law, existing opinions and clarifications by the FCC, administrative rulemaking still on the horizon, and vary-

ing court decisions. Accordingly, the Court is compelled to provide significant detail with regard to the arguments of the parties. While this necessarily creates a lengthy order, no more condensed method seems adequate to the task of demonstrating both the nature of the dispute and the Court's resolution of that dispute.

## A. Standard for Summary Judgment

"[C]laims lacking merit may be dealt with through summary judgment under Rule 56." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be rendered

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

To avoid summary judgment, the nonmoving party must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *See Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir.1995). Relevant to the present action, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The nonmoving party must go beyond the pleadings, and by affidavits, depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The Court must view all of the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir.1996). While the quantum of proof that must be produced to avoid summary judgment is not precisely measurable, it must be enough evidence for a reasonable jury to return a verdict in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Compensation Sought

As relevant to this case, there are two types of charges which one carrier can extract from another for the provision of telecommunication services. The first deals with local telephone service and is referred to as reciprocal compensation. " '[R]eciprocal compensation' means that when a customer of one [LEC] calls a customer of a different [LEC] who is within the same local calling area, the first carrier pays the second carrier for completing, or 'terminating,' the call." *Pac. Bell v. Pac–West Telecomm., Inc.*, 325 F.3d 1114, 1119–20 (9th Cir.2003). As stated by the Eighth Circuit, "[u]nder the 1996 Act, the amount an ILEC can charge for allowing a competitor to use its infrastructure to deliver a local call is to be determined by an interconnection agreement negotiated (or imposed by arbitration) between the ILEC and the interconnecting carrier that has been approved by the state commission." *INS v. Qwest II*, 363 F.3d at 686 (citing 47 U.S.C. §§ 251(c)(1); 252(e)).

The second type of charge at issue is an "access" fee charged by common carriers for use in carrying long-distance telecommunications via their infrastructure, otherwise referred to as toll services. *See id.* (citing 47 U.S.C. §§ 201 (requiring common carriers engaged in interstate communication to furnish communication service upon request, to establish physical connections with other carriers, and to establish through routes), and 202 (prohibiting discrimination related to the use of common carrier lines of communication)). These charges are set by the common carriers in tariffs filed with either the FCC or the appropriate state commission. *See* 47 U.S.C. § 203(a).

In the present action, INS asserts it is owed payment of access charges pursuant to the tariffs it has filed with the FCC and the IUB. Meanwhile, Qwest asserts the appropriate compensation mechanism under the 1996 Act and the FCC's pre–1996 Act decisions is reciprocal compensation in negotiated (or arbitrated) interconnection agreements, not access charges via tariffs, and that Qwest is not required to pay such compensation pursuant to the decisions of the IUB.

## C. The Parties and the Traffic at Issue

### 1. Type of Traffic

#### a. "Local" versus "Long Distance" Traffic

■ In its *Local Competition Order*, the FCC had to determine which telecommunications are subject to "reciprocal compensation" for "transport and termination" under section 251(b)(5). In so doing, the FCC distinguished between transport and termination of "local" calls, and that for "long-distance" calls, the latter having been historically subject to access charges. *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. For purposes of regulation, a call is treated as "local" if it originated and terminates in the same local calling area; a call is treated as "long distance" if it terminates in a local calling area different than the one in which it originates.[24] *See Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068, 1072 n. 3 (8th Cir.1997) ("*CompTel*").

The FCC concluded that "section 251(b)(5) reciprocal compensation," and not "access charges," would apply "to traffic that originates and terminates within a local calling area, as defined" in a subsequent paragraph. *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. In defining the local service area for calls to or from a CMRS network for purposes of applying sections 251 and 252, the FCC determined that the MTA serves as the most appropriate definition for local service area for CMRS traffic. *Id.* at *302, 11 FCC Rcd. at ¶ 1036. "Accordingly, traffic to or form a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate ac-

---

24. Long distance service is provided to the subscribers of "interexchange" (i.e., "long distance") carriers often referred to as "IXCs". For the origination and termination of long distance calls placed by their subscribers, IXCs use the LECs' local networks for which the IXCs pay "access charges." *See Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 520, 522 n. 2 (8th Cir.1998). IXCs recover the costs they incur, including originating and terminating access charges payable to LECs, in the rates they charge their end-user customers. *Id.; see also Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046 (noting that "in the access charge regime, the long distance caller pays long-distance charges to the IXC, and the IXC must pay both LECs for originating and terminating access service").

cess charges." *Id.*[25] In contrast, "traffic originating or terminating outside of the applicable local area would be subject to interstate and intrastate access charges" payable by the long distance carriers using the LECs' networks to provide the "end to end" service that they "sell as [their] product to [their] customers." *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d at 542 n. 9.[26]

To summarize, the FCC's *Local Competition Order* provides that "traffic to and from a CMRS network that originates and terminates with the same MTA" is "local" traffic, and not long distance traffic subject to access charges. Qwest argues that this is so regardless of whether one or more intermediate or transiting carriers provide a portion of the transport of the call from the network of the CMRS provider to the network of the terminating LEC. According to Qwest, under the FCC decisions, the relevant facts are the geographic locations of the end-user customers placing and receiving the calls, not the method of interconnection chosen by the originating and terminating carriers.

In its decision, the Board explained that this determination means Qwest is not acting as an IXC providing long distance service to end users when the calling and called parties are located in the same MTA and the caller is served by a third-party CMRS provider. *IUB Proposed Decision*, at 13. Instead, Qwest is "providing an indirect connection for *local* traffic." *Id.* (emphasis added). Based on this determination, the IUB held that Qwest "has no obligation to pay access or other termination fees." *Order Affirming Proposed Decision*, at 2.

Qwest asserts that all federal courts to consider this issue have ruled, like the Board, that indirect connection through a transiting carrier does not convert intraMTA "local" calls into "long distance" calls for which the transiting or any other carrier must pay "access" charges to the terminating carrier.[27] For example, in *3 Rivers Telephone Cooperative, Inc. v. U.S. West Communications, Inc.*, the court reasoned that the FCC's *Local Competition Order* "makes no distinction between such traffic [i.e., traffic delivered over a direct connection] and traffic that flows between a

---

25. These rulings were subsequently codified in FCC regulations at 47 C.F.R. § 51.701.

26. The Eighth Circuit has affirmed the FCC's determinations to require LECs to charge rates for the use of their networks to transport and terminate "local" calls that differ from the rates they are permitted to charge for the transport and termination of "long distance" calls. *CompTel*, 117 F.3d at 1073. This case also affirmed that IXC's must pay access to LECs for terminating their calls. *Id.*

In reaching this decision, the court held the duty to interconnect is limited to an obligation to provide physical interconnection. *Id.* This means that ILECs do not have to provide transmission and routing services. *Id.; see also AT&T Corp. v. FCC*, 317 F.3d 227, 234–35 (D.C.Cir.2003) (relying on *CompTel* and concluding that the requirement for physical connection does not also require the exchange of traffic).

27. Qwest notes the decisions of the state commission and state courts of Missouri which approve the use of tariffs in lieu of interconnection agreements to establish compensation for the termination of intraMTA wireless traffic. *See In the Matter of Mark Twain Rural Telephone Company's Proposed Tariff to Introduce Its Wireless Termination Service*, 2001 WL 584348, at *6, 2001 Mo. PSC LEXIS 760, Case No. TT–2201–139, at *20 (Mo. PSC 2001) (citing *In the Matter of Alma Telephone Co.*, Case No. TT–999–428 (Mo. PSC 2000)). Qwest asserts, however, that these decisions *reject* the argument that use of a transit carrier converts what would otherwise be a local call into a long distance call, thereby allowing the terminating carrier to seek access charges or other compensation from the transiting carrier as opposed to the originating carrier, *see id.*, and thus do not contradict the decisions cited by Qwest.

CMRS provider and LEC in the same MTA that also happens to transit another carrier's facilities prior to termination." *3 Rivers Tel. Coop., Inc. v. U.S. West Communications, Inc.*, 2003 U.S. Dist. LEXIS 24871, at *67 (D.Mt.2003), *accord. Union Tel. Co. v. Qwest Corp.*, slip op., No. 02–CV–209B, at 26, 34 (D.Wyo. May 11, 2004); *see also Atlas Tel. Co. v. Corp. Comm'n of Okla.*, 309 F.Supp.2d 1299, 1310 (W.D.Okla.2004) (finding, consistent with the determination of the Oklahoma Commission decision being reviewed, that the FCC's classification of "mobile intraMTA traffic" as "local" as opposed to "toll" (i.e., interexchange or long distance) traffic applies "without regard to whether those calls are delivered via an intermediate carrier").[28] Accordingly, the *3 Rivers* court held that "Qwest is not liable to plaintiffs for terminating access charges on CMRS (wireless) traffic that both originates and terminates in the same MTA."[29] *Id.* at *68–69.

Qwest further asserts that the FCC's own decisions foreclose any doubt that indirect interconnection does not convert intraMTA (i.e., "local") calls into "long distance" calls or otherwise justify the imposition of a compensation obligation for such calls on a transiting carrier. Qwest points out that in Paragraph 1039 of the *Local Competition Order* the FCC acknowledges the existence of indirect interconnection between originating and termination carriers through "facilities provided by alternative carriers," but no-

where held such an arrangement converted a "local" call into a "long distance" call or allowed other carriers to impose a compensation obligation on the transiting carrier. *See Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. Additionally, in its *Intercarrier Compensation NPRM*, the FCC confirmed that use of a transit carrier for intraMTA calls is a form of "local" connection. NPRM, *Developing a Unified Intercarrier Compensation Regime*, 2001 WL 455872, at *25, 16 FCC Rcd. 9610, at ¶ 91 (2001) ("*Intercarrier Compensation NPRM*").

In addition, Qwest argues that the FCC held specifically that the "cost causation principles" underlying its intercarrier compensation rules "allocate" the cost of delivering traffic to the carriers responsible for the traffic and, ultimately, their customers. *Texcom Inc. v. Bell Atlantic Corp.*, 2001 WL 1504282, at *2, 16 FCC Rcd. 21493, at ¶ 6 (2001) ("*Texcom Order*"); *see also Texcom Inc. v. Bell Atlantic Corp.*, 2002 WL 459938, at *2, 17 FCC Rcd. 6275, at ¶ 4 (2002) ("*Texcom Reconsideration Order*") (citing 47 U.S.C. § 251(b)(5), and 47 C.F.R. § 51.702). Thus, where a transiting carrier is involved, the originating third-party carrier pays for the cost of delivering their calls to the transiting carrier, while the terminating carrier pays for the cost of transporting that traffic from the transiting carrier's network to its network. *Texcom Order*, at *2, 16 FCC Rcd.

---

**28.** In a related case, Qwest draws the Court's attention to a recent decision from the U.S. District Court for the District of Nebraska where the court held, like the courts in *3 Rivers* and *Union*, that under the FCC's decisions, originating carriers must pay compensation to terminating carriers under the reciprocal compensation provisions of the 1996 Act "whether or not the call was delivered via an intermediate carrier." *WWC License, L.L.C. v. Boyle*, slip op., Docket No. 4:03CV3393, at *6 (D.Neb. Jan. 20, 2005).

**29.** The *3 Rivers* court also rejected the argument that paragraph 1043 of the *Local Competition Order* "carved out an exception that preserves the access charge system for wireless calls that were subject to access charges prior to the 1996 Act." *3 Rivers Tel. Coop., Inc.*, 2003 U.S. Dist. LEXIS 24871 at *67; *see also IUB Proposed Decision*, at 12–13 (rejecting same argument).

at ¶ 6; *Texcom Reconsideration Order,* at *2, 17 FCC Rcd. at ¶ 4. The terminating carrier may then "seek reimbursement of these costs from originating carriers through reciprocal compensation." *Texcom Reconsideration Order,* at *2, 17 FCC Rcd. at ¶ 4 (citing 47 U.S.C. § 251(b)(5), and 47 C.F.R. § 51.702). Thus, transiting carriers bear no responsibility for compensating other carriers, for they lack relationships with either the calling or called parties. Qwest asserts that this scheme is particularly manageable and sensible here because of the affiliation between INS and the terminating ILECs, and because, as the Board explained, "connecting the independent LECs to other telecommunications carriers in an efficient manner is the very reason for INS's existence." *IUB Order Denying Application for Rehearing,* at 12.[30]

Finally, Qwest contends that the FCC's Common Carrier Bureau, acting on behalf of the FCC in place of a state commission, has stated that federal law does not require a transiting carrier over its objection to compensate another carrier for its transport and termination of calls originated by third-party carriers under the theory that the calls are the transiting carrier's "own traffic", *see Petition of WorldCom Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virgi-*

nia *Inc., and for Expedited Arbitration, Memorandum Opinion and Order,* 2002 WL 1576912, at *154, 17 FCC Rcd. 27039, at ¶ 541 (2002) (*"Verizon Virginia Order"*); *see also id.* at *34, 36, 17 FCC Rcd. at ¶¶ 114, 119, and that there is no evidence in the Board's record that Qwest refused to provide to terminating LECs information received by Qwest from the originating CMRS providers. *See Petition of Cavalier Telephone LLC Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corp. Commission Regarding Interconnection Disputes with Verizon Virginia, Inc., and for Arbitration,* 2003 WL 22939121, at *12, 18 FCC Rcd. 25887, at ¶ 42 (FCC Wireline Competition Bureau 2003) (*"Cavalier"*). Based on these decisions, Qwest argues that transiting carriers have no compensation obligations with respect to the transport and termination of intraMTA wireless or other local calls originated by end-user customers of third-party carriers under the Act.

INS, on the other hand, argues that Qwest improperly relies on the "local" terminology to support its argument that intermediary carriers are barred from collecting access charges for transiting intraMTA traffic. INS contends the FCC has abandoned the "local" terminology as it is "not accurate to simply describe intraMTA calls (which can cover very long distances) as local."[31] *See Intercarrier*

---

**30.** Qwest asserts the Board's determination that INS should seek compensation from the originating CMRS providers is also consistent with the "cost causation" principles relied upon by the FCC. In any event, Qwest asserts the Court need not decide which carrier, originating or terminating, is responsible for compensating a transiting carrier; rather, all that matters here is that the obligation is not that of another transiting carrier.

**31.** According to INS, the FCC now orders carriers to use the term "section 251(b)(5)

traffic" in lieu of the term "local traffic". *See Verizon Virginia Order,* at *88, 17 FCC Rcd. at ¶ 315. Changes removing all references to "local" in the reciprocal compensation rules were published at 66 Fed.Reg. 26806 (May 15, 2001) and incorporated into the Code of Federal Regulations. *See, e.g.,* 47 C.F.R. § 57.701; *see also* 61 Fed.Reg. 45632 (Aug. 29, 1996); *Level 3 Communications, LLC v. Colorado Pub. Utils. Comm'n,* 300 F.Supp.2d 1069, 1076 (D.Colo.2003) (finding the new version of rules governs).

*Compensation for ISP–Bound Traffic, Implementation of the Local Competition Provisions of the Telecommunications Provisions in the Telecommunications Act of 1996,* 2001 WL 455869, at \*15, 16 FCC Rcd. 9151, at ¶ 45 (2001) (*"ISP Remand Order"*), *remanded on other grounds,* 288 F.3d 429 (D.C.Cir.2002)[32] (reasoning that eliminating the category of "local" traffic better reflects the role of section 251(g) in distinguishing between charges that are governed by reciprocal compensation rules and charges that are governed by the access rules).

Qwest counters that the Board considered and correctly rejected INS' contention that the FCC has abandoned the "local" terminology for purposes of intercarrier compensation in general and wireless traffic in particular, and thereby confirmed CMRS-originated traffic that had previously been subject to terminating access charges was unaffected by the 1996 Act and the *Local Competition Order. IUB Order Affirming Proposed Decision,* at 5–6. As the Board explained, the FCC "clearly states" in the *ISP Remand Order* that the ISP data traffic analysis "does not apply to CMRS traffic." *Id.* (citing *ISP Remand Order,* at \*16, 16 FCC Rcd. at ¶ 47 ("[T]he analysis we adopt in this *Order,* that section 251(g) limits the scope of section 251(b)(5), does not affect the application of the latter section to LEC–CMRS interconnection.")). Indeed, Qwest argues that the INS' argument is further refuted by the fact that, on the very same day it issued the *ISP Remand Order,* the FCC also released its *Intercarrier Compensation NPRM,* which reiterated that access charges do not apply to "the transport and termination of local traffic." *Intercarrier Compensation NPRM,* 1996 WL 452885, 11 FCC Rcd. at ¶ 6.

The Court finds the Board's determinations that the traffic at issue here is "local" traffic and not long distance is supported by the 1996 Act and FCC decisions implementing and explaining the Act. The Board interpreted the FCC's definition of "local" traffic to include all traffic that both originates and terminates within the same MTA, which is the type of traffic in dispute. The Board concluded that this definition holds regardless of whether transiting carriers are involved in the transportation of the call from the originating customer to the end user being called. The Court finds these determinations are wholly reasonable and in accordance with the current state of the law governing telecommunications.

In other words, the IUB did not violate federal law in rendering decision within its jurisdiction that the traffic from third-party CMRS providers that Qwest carries (as a transiting carrier) and transports to INS' network is "local" traffic under the 1996 Act and as defined by the FCC in its *Local Competition Order.* As will become apparent, the Court's conclusion on this matter contributes greatly to the resolution of a myriad of issues argued in this complex case.

### b. IntraMTA Versus InterMTA and Wireless Versus Wireline

INS contends that Qwest, as the summary judgment proponent, has not carried its burden of proof in establishing that its nonpayment is for intraMTA calls. INS acknowledges that there are intraMTA wireless-originated calls at issue in this case, but the relative proportion of those calls compared to other calls delivered by Qwest for which Qwest has not paid is unknown. Indeed, INS asserts Qwest has provided no evidence or records to support its contention that all of the wireless calls

---

**32.** The *ISP Remand Order* remains in effect. *Verizon Maryland, Inc. v. Global NAPs, Inc.,* 377 F.3d 355, 367–68, 2001 U.S.App. LEXIS 15849, at \* 31 (4th Cir.2004).

involved in this case are intraMTA calls. INS asserts this question of material fact precludes grant of summary judgment as the success of Qwest's entire argument is premised on all of the calls being intraMTA.

While INS is seeking compensation from Qwest for each of the calls that Qwest delivered to INS for completion, the proportion of the unpaid calls that are wireless-originated as opposed to originating on the Qwest network or that of another landline carrier is not established on the record before the Court. According to INS, Qwest simply assumes without evidence that all the calls for which it did not pay are wireless originated. In fact, INS points out that in a case pending in the U.S. District Court for the Northern District of Iowa, Qwest has recently alleged that some of the calls it delivered to INS, which forwarded the calls to an independent LEC, were in fact originated by landline long distance carriers. *See* Order, *Northwest Iowa Tel. Co. v. Qwest,* Case No. 04–4053 (Dec. 17, 2004). As in that case, INS asserts discovery is needed to determine the true nature of the calls at issue.

The Court finds the exact nature of each of the calls at issue is not dispositive of Qwest's motion for summary judgment. While a factual dispute is apparent, this does not generate a *material* issue of fact if the law requires INS to proceed through the process of negotiation and arbitration, rather than pursuant to tariffs or equitable remedies, before a legally supportable claim may be advanced in this Court.

## 2. Regulatory Classification of Parties

### a. INS

INS has claimed before the Board, this Court, and the Eighth Circuit that it is not an ILEC, and that, as a result, the Section 251(c)(1) duty to negotiate and the Section 252 negotiation/arbitration process do not apply to it. INS then contends that consequently, the Board's decision that it should seek compensation in the negotiations between the originating CMRS providers and the terminating ILECs is unlawful. Qwest argues that INS is mistaken, as its regulatory classification is not relevant to the lawfulness of the decisions in the Board's proceeding.

The Court finds the regulatory classification of INS is not pertinent given this Court's essential determination of the validity of the IUB decision. In other words, the Court finds it need not resolve whether INS is acting as an LEC with respect to the traffic at issue. As the Court concludes above, the Board determined the traffic at issue is local and strongly suggested the parties, including INS, engage in negotiations to resolve the disputes concerning the traffic at issue. As a result of this ruling, INS' regulatory classification becomes irrelevant for purposes of engaging in negotiations pursuant to the Board's lawful orders.

### b. Qwest

■ The regulatory classification of Qwest is, however, pertinent as there exists within the reciprocal compensation rules an exception for IXCs.[33] Thus, to determine whether Qwest is liable for access charges under the IXC exception to the intraMTA rules, it is necessary to decide whether Qwest is acting as an "incumbent LEC" or as an "interexchange carrier" in the circumstances giving rise to this action. INS points out that the Eighth Circuit held in its order remanding this case that Qwest is *not* acting as an incumbent LEC with respect to the calls at issue. *INS v. Qwest II,* 363 F.3d at 693 n.

---

**33.** *See* discussion *supra,* at Section D.4.

3. Instead, INS posits Qwest is acting as an IXC.

It is undisputed that the calls at issue travel state-wide and so cross the boundaries of local exchanges, meaning they are interexchange. *INS v. Qwest I*, 2002 WL 31296324, at *1–3. Further, INS asserts Qwest acted in a manner indistinguishable from any other IXC purchasing access service in the following manner: (1) Qwest's facilities are landline as opposed to wireless, (2) Qwest delivered written "Access Service Requests" to INS to establish the trunks designated for interchange carriers over which Qwest delivers the calls at issue, (3) those trunks are the same trunks used to carry ordinary wireline-to-wireline long distance calls, (4) those trunks are the same trunks for which Qwest has paid access charges to INS in the past, and (5) Qwest makes no effort to distinguish or separate intraMTA wireless-originated calls from other long distance traffic. Indeed, Qwest paid for these calls pursuant to access tariffs for many years. *See INS v. Qwest II*, 363 F.3d at 684; *see also CompTel*, 117 F.3d at 1072 (recognizing that IXCs are the purchasers of access service).

The IUB recognized the IXC exception but construed it as being limited to IXCs that directly serve the end-user customers, thereby excluding IXCs hired by other carriers. The Board then determined Qwest is not acting as an IXC providing long distance service to end users with whom it has a billing relationship, *Proposed Decision and Order*, at 13, but is providing an indirect connection for calls placed by end-user customers of other carriers. Consequently, the Board held that "Qwest has no obligation" to pay INS and its ILEC owners "access" charges or other fees for the transport and termination of such calls. *IUB Order Affirming Proposed Decision*, at 2.

INS asserts the IUB misconstrued federal law on this issue. INS contends that, constructively, the IUB read the term "IXC" as limited to IXCs acting in a retail capacity. According to INS, the plain definition of "IXC" under federal law is not limited to retail IXCs, but includes IXCs providing service to other carriers. *See AT&T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352, 1353 (Fed.Cir.1999) (describing provision of service by "facilities-based IXCs to other carriers"); *Southwestern Bell Tel. Co. v. FCC*, 116 F.3d 593, 595 (D.C.Cir.1997) (same); *Bell Atlantic–Delaware, Inc. v. Frontier Communications Services, Inc.*, 2001 WL 327619, at *1–2, 16 FCC Rcd. 8112, ¶ 3 (2001); *Application of WorldCom, Inc. and MCI Communications Corp. for Transfer of Control*, 1998 WL 611053, at *11, 13, 14, 14, 15, 21, and n. 223, 13 FCC Rcd. 18025, ¶¶ 34, 44, 45, 48, 50, 70, and n. 223 (1997) (*"Application of WorldCom"*) (discussing in detail how IXCs provide both wholesale and retail long distance service). Thus, INS asserts that both retail and wholesale IXCs purchase access service. *See Southwestern Bell Tel. Co. v. FCC*, 116 F.3d at 595. INS argues that providing capacity that other carriers may use in routing a call, as Qwest does in the present case in carrying calls from the CMRS providers networks to the INS network, is a basic, wholesale long distance function, *see Application of WorldCom*, at *15, 13 FCC Rcd. at ¶ 50; *AT & T Corp. v. American Cash Card Corp.*, 184 F.R.D. 515, 518 (S.D.N.Y.1999), and that the *3 Rivers* court, on remand from the Ninth Circuit, rejected Qwest's arguments that liability for access charges was limited to situations in which Qwest was acting in a retail capacity. *3 Rivers Tel. Coop.*, 2003 U.S. Dist. LEXIS 24871, at *44.

INS further asserts that nothing in the *Local Competition Order* alters the normal definition of IXC as to limit the term to

IXC acting in a retail capacity and excluding IXCs hired by other carriers. To the contrary, INS argues that limiting the IXC exception to retail IXCs would effectively eviscerate the exception because retail IXCs are rarely if ever involved in carrying wireless-originated calls. The FCC acknowledged contemporaneously with issuing its *Local Competition Order* that Congress, in another provision of the Telecommunications Act of 1996, exempted wireless carriers from the duty imposed on landline LECs to allow their end users to select a retail IXC of their choice. *See In the Matter of Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Service,* 1996 WL 740758, 11 FCC Rcd. 12456, at ¶ 3 (1996) (recognizing that because of Section 332(c)(8), CMRS carriers are not required to let the consumer choose a long distance carrier); *see also* 47 U.S.C. § 332(c)(8). Thus, according to INS, given this freedom, wireless carriers that desire assistance in carrying calls route them to wholesale IXCs, thereby keeping control of the relationship with the end user.

Moreover, INS asserts that, because of the issue in the present case, it makes far more sense to evaluate whether Qwest acted as IXC based on its relationship with INS than on the fortuity of whether an end user or another carrier hired Qwest. INS points out that Qwest submitted "Access Service Requests" to INS, sent traffic over long distance access trunks used by other IXCs, and paid for these calls for years pursuant to access service tariffs. According to INS, the practical impact of Qwest's involvement, i.e., it prevents INS from directly measuring the traffic from each wireless carrier, is the same regardless of who hired Qwest. *See Nat'l Indus. Constructors, Inc. v. Occupational Safety & Health Rev. Com'n,* 583 F.2d 1048, 1055 (8th Cir.1978) (finding "regulations should be given a reasonable, common sense interpretation" whenever possible).

Finally, INS urges the Court to keep in mind the fundamental purpose of Section 251 in general, and the reciprocal compensation rules in particular, is to promote competition for local telephone service. *Southwestern Bell Tel. Co. v. Connect Communications Corp.,* 225 F.3d 942, 944 (8th Cir.2000) (noting 1996 Act is intended to "jump-start" local competition). The FCC's reciprocal compensation rules apply to "competing" local service providers.[34] *Local Competition Order,* at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. According to INS, the purpose of promoting local competition is advanced when a wireless carrier builds facilities in order to enter the market in an area served by a rural ILEC and can use the MTA rule to establish a larger area than the ILEC's smaller traditional calling area in which calls may be exchanged free of access charges.

INS argues that here Qwest proposes to set aside the IXC exception and apply the MTA rule even where there is no local competition between the wireless carriers and the rural ILEC. INS avers that this interpretation would eliminate access charges to rural ILECs for out of state wireless carriers (but still located in the

---

34. The reciprocal compensation rules apply when "competitors are required to use the incumbent LECs' existing networks to terminate calls to incumbent LEC customers", when "terminating traffic destined for competing Carriers' subscribers", and "when transporting and terminating a call that originated on a competing carrier's network." *Local Competition Order,* at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. The only known exception where reciprocal compensation applies to calls between noncompetitors is the so-called "neighboring ILEC" exception, where the custom prior to the 1996 Act (where neighboring ILECS exchanged calls free of access charges pursuant to the extended area service ("EAS")) was carried forward. *See* 47 C.F.R. § 51.711(a)(2).

Des Moines MTA) or carriers serving primarily in urbanized areas as long as these carriers routed the calls through Qwest. Indeed, INS notes Qwest has offered no evidence that any substantial portion of the calls at issue involve competing wireless carriers and rural ILECs.

Thus, according to INS, Qwest is a landline provider hired to carry calls from a customer of one local service provider (the wireless carrier) to a customer of another local service provider (the rural ILEC) without regard to whether the local service providers are competing. INS argues this is consistent with the classic IXC function for which IXCs pay access charges, *see United States Tel. Assoc. v. FCC*, 188 F.3d 521, 523 (D.C.Cir.1999), which is not a local competition function to be governed by the reciprocal compensation rules. In short, INS contends Qwest acted as an IXC in delivering the calls to INS (or at the very least, INS has raised genuine issues of material fact as to whether Qwest was acting as an IXC), and the IXC exception supports the application of access charges to the intraMTA intrastate wireless-originated calls involved in this case.

Qwest urges the Court to find the Board properly rejected the arguments of INS and its ILEC owners that the FCC's statements in paragraph 1034 of the *Local Competition Order* about the imposition of access charges on IXCs apply to indirect interconnection by Qwest for intraMTA calls originated by third-party CMRS providers. According to Qwest, the Board correctly construed paragraph 1043 to refer to "long distance traffic delivered to the LEC by a classic IXC, such as AT & T, which has a billing relationship with the customer who initiates the call." *IUB Proposed Decision*, at 13. Conversely, the Board held "the FCC's analysis is not applicable to a carrier in the position that Qwest occupies in this case, where it has no end-user customer in the transaction who can be billed for the costs Qwest incurs to complete these calls." *Id.*

The Board explained additionally that paragraph 1043 refers to payment or nonpayment of access charges "by CMRS providers," not to "intermediate carriers like Qwest," and that such "traffic ... is not Qwest's toll traffic." *Id.* According to Qwest, this is a reference to the fact that access charges are payable by the carrier whose network originates the call, and only on toll, i.e., long distance, traffic.

Qwest next argues the fact that some IXCs pay access charges not only for long distance calls placed by their end-user customers but also for such calls placed by end-user customers of third-party carriers that "resell" the IXC's services does not undermine the Board's analysis, as INS contends, for two reasons. First, in the resale scenario, the IXC is selling an "end-to-end" service that includes the access service provided by the originating an terminating LECs. The rates charged to the reseller by the IXC thus cover the access charges paid by the IXC to the LECs and are not passed through to the end-user customers of the IXC. According to Qwest, the record before the Board establishes Qwest did not sell the CMRS providers an end-to-end or other service that included transport by INS and termination by INS' ILEC owners and that Qwest's rates to the CMRS providers (about 1/4 cpm) did not cover the rates that INS (about 1.14 cpm) and its ILEC owners (an average of about 9.2 cpm) seek from Qwest. Second, Qwest points out that the services and calls at issue in the cases cited by INS were long distance, not local.

Finally, Qwest argues there is no merit to INS' arguments that, with respect to the traffic at issue, "Qwest acts in a manner that is indistinguishable from any other IXC purchasing access service." Qwest asserts the fact that its facilities are land-

line as opposed to wireless and that the calls at issue cross exchange boundaries is irrelevant;[35] rather, it is relevant that the calls are originated over the networks of CMRS providers by their end users and the fact that the local calling area is defined in terms of an MTA, not an exchange. Likewise irrelevant, according to Qwest, is the fact it delivers local and long distance over the same trunk group as no FCC or Board decision holds the classification of a call depends on the trunk group over which it is delivered. Finally, Qwest maintains equally irrelevant is the fact that it had in the past submitted "ASRs" and paid "access charges" to INS in light of changes in the law effected in the *Local Competition Order*,[36] and the resultant cessation of ordering access service for the calls at issue by Qwest in April 1999. *See IUB Proposed Decision*, at 37–38.

Further, Qwest states it is worth noting that in both *Texcom* and the *Intercarrier Compensation NPRM*, the FCC referred to the transiting carrier as a LEC or ILEC, not as an IXC. *Texcom Order*, at *1, 2, 3, 16 FCC Rcd. at ¶¶ 2, 5, 10; *Intercarrier Compensation NPRM*, 1996 WL 452885, 11 FCC Rcd. at ¶ 6. Qwest contends the point here is not that Qwest, the transiting carrier in *Texcom*, or the hypothetical transiting carrier in the *Intercarrier Compensation NPRM* were acting as LECs or ILECs for the calls at issue; rather, the point is that they were not

acting as IXCs. According to Qwest, transiting carriers in these circumstances are acting neither as IXCs nor LECs.

In summary, in the Board's proceeding, the IUB determined Qwest does not, pursuant to its transiting agreements with the wireless carriers, provide "long distance" or any other service to the end-user customers of those carriers, and Qwest has no billing relationship with those customers. *See IUB Proposed Decision*, at 13. According to Qwest, its customers are the wireless carriers, which purchase a transit service wherein Qwest provides an indirect connection to INS. Moreover, the calls at issue begin and end in the same MTA and are therefore local. Additionally, Qwest contends it does not provide an "and-to-end" service that includes origination and termination of the calls at issue, a fact that distinguishes Qwest's activity from those carries offering long distance resale services.

INS responds that Qwest's argument that is not an IXC by distinguishing its service from that provided by an IXC reseller providing end-to-end service is flawed. According to INS, it makes no difference if Qwest's rates do not cover INS' access charges as the geographic rules promulgated by the FCC will result in the rates charged by IXCs not covering their access charges in some areas. *See, e.g.,* 47 C.F.R. § 64.1801[37] (providing that

---

**35.** Even if it were relevant, Qwest contends it did not transport the calls at issue over an exchange boundary. Qwest explains that the distance between its switch and INS' switch is a mere six blocks, and that undisputed fact underscores that Qwest is not providing a "long distance" service but rather is simply providing an indirect method of interconnection between the originating CMRS providers and INS and its ILEC owners.

INS argues that it makes no difference whether Qwest transports a call six blocks or 600 miles, as it is the beginning and end points of a call that determines whether the

call is long distance. *See* 47 U.S.C. § 153(48). According to INS, Qwest acts as an IXC with regard to the intraMTA traffic because the beginning and end points of the call lie in different exchanges.

**36.** Qwest further asserts the FCC and Bureau decisions subsequent to the *Local Competition Order* confirm the lack of relevance to the circumstances upon which INS relies in arguing Qwest is acting as an IXC.

**37.** Promulgated pursuant to 47 U.S.C. § 254(g).

the rates charged by IXCs to subscribers in rural and high cost areas be no higher than the rates charged to its subscribers in urban areas, and as applied on a state-by-state basis). Thus, INS argues whether or not Qwest's rates cover access charges is not dispositive of whether Qwest is an IXC, though it does raise questions not appropriate for decision on summary judgment.

Moreover, INS asserts Qwest is an IXC because of the arrangements that it has made with CMRS carriers for Qwest to provide long distance service to the end users of those carriers. As noted, CMRS providers are not required to permit end users to select the long distance provider for their choice, *see* 47 U.S.C. § 332(c)(8), and Qwest has entered into contractual arrangements with CMRS providers to be the long distance provider for those carriers' end users (thereby becoming the long distance company for those end users). INS asserts that Qwest then assesses a separate "toll", i.e., "long distance", charge to the wireless carriers to carry calls between exchanges, and that charge is passed on to the end users.

While these complex arguments seem more focused upon what the law should be, or may become through this gradual evolution, the Court is obliged to make a determination of the current state of the law and the power and authority still in the IUB. At bottom, the Court finds the reasoning and results reached by the IUB to be compelling on this issue. The Court finds the Board's determination that Qwest is not acting as an IXC with respect to the traffic at issue is consistent with federal law. The interpretation of the Board of the definition of IXC, and specifically that an IXC must have a billing relationship with the end-user customer, is compatible with FCC determinations, and INS has pointed to no authority finding otherwise. Accordingly, the Court recognizes and ac-

cepts the Board's finding that Qwest is not an IXC in the instant case.

## D. Reciprocal Compensation and Access Charges

■ INS states that Qwest's primary argument is that the FCC's reciprocal compensation rules (specifically the MTA rule) became the exclusive source of compensation for every carrier involved in every aspect of every intraMTA wireless-originated call, to the exclusion of access charges. INS contends Qwest erred in its description and interpretation of the reciprocal compensation rules, which, according to INS' reasoning, do not apply in the present case. Qwest counters that the Board correctly determined the reciprocal compensation rules are applicable, and that under these rules, Qwest is under no obligation to compensate INS for its transit service (with this obligation belonging to the third-party CMRS providers originating the calls at issue).

### 1. Access Charges and Tariffs

Prior to the 1996 Act, the FCC issued several decisions related to interconnection between wireless carriers and wireline local telephone companies (i.e., LECs) pursuant to section 201 of the Communications Act of 1934, 47 U.S.C. § 201. Specifically, the FCC held "the cellular carrier should be permitted to choose the type of interconnection", *Policy Statement, The Need to Promote Competition and Efficient Use of the Spectrum for Radio Common Carrier Services,* 59 RR2d 1275, Appendix B, at ¶ 3 (1986) (*"Efficient Use Policy Statement"*); *see also Implementation of Sections 3(N) and 332 of the Communications Act,* 1994 WL 76285, at *33, 9 FCC Rcd. 1411, at ¶ 230 (1994) (hereinafter *"Section 332 Implementation Order"*) (finding it "in the public interest to require LECs to provide the type of inter-

connection reasonably requested by all CMRS providers"), though the wireline carrier was obligated only to provide "a form of interconnection no less favorable than that furnished to the wireline carrier." *NECA Exchange No. 9: Radio Common Carrier Services* 4 (National Exchange Carrier Ass'n, Inc.1992). The FCC also adopted the principle of "mutual compensation", meaning that wireless carriers and LECs were required to compensate one another for the transport and termination of calls originating on each other's networks. *Section 332 Implementation Order,* at *62–63, 63, 9 FCC Rcd. at ¶¶ 229–31, 233; *see also Declaratory Ruling, Need to Promote Competition and Efficient Use of Spectrum for Radio Common Carrier Services,* 1987 WL 344946, *2, 3, 4, 5, 6, 2 FCC Rcd. 2910, at ¶¶ 4, 6, 8, 12, 17, 21 (1987) (hereinafter *"Efficient Use of Spectrum "*).

In addition, the FCC required that the rates, terms, and conditions applicable to the exchange of traffic between end-user customers of wireless carriers and LECs be established through interconnection agreements, *Efficient Use of Spectrum,* at *14, 2 FCC Rcd. at ¶¶ 54–56; *Order on Reconsideration, Need to Promote Competition and Efficient Use of Spectrum for Radio Common Carrier Services,* 1989 WL 511750, *3, 4–5, 4 FCC Rcd. 2369, at ¶¶ 10, 13–14 (1989) (hereinafter *"Order on Reconsideration "*), "if the non-wireline carrier chooses to negotiate such with the telephone company." *NECA Exchange No. 9: Radio Common Carrier Services* 4. The FCC stated that tariffs should be filed "only after the co-carriers have negotiated agreements on interconnection." *Efficient Use of the Spectrum,* at *14, 2 FCC Rcd. at ¶ 56; *Order on Reconsideration,* 1989 WL 511750, at *4–5, 4 FCC Rcd. 2369 at ¶¶ 13–14. The FCC instructed carriers to file complaints, not tariffs, if they were unable to negotiate agreements without regulatory intervention. *Efficient Use of*

*Spectrum,* at *14, 2 FCC Rcd. at ¶ 56; *Order on Reconsideration,* at *5, 4 FCC Rcd. 2369 at ¶ 15.

Based on concerns about interference with its authority to regulate interconnection for the purpose of interstate traffic, in 1987 the FCC preempted state regulations of intrastate interconnection that are inconsistent with its "mutual compensation" and "negotiated agreement" requirements. *Efficient Use of Spectrum,* at *6, 2 FCC Rcd. at ¶ 21. With these exceptions, the FCC has refused to preempt state regulations addressed to interconnection between wireless carriers and LECs, reasoning that because wireless carriers are

> primarily engaged in the provision of "local, intrastate, exchange telephone service, the compensation arrangements among [wireless] carriers and local telephone companies are largely a matter of state, not federal concern." The [FCC] further determined that these arrangements are "properly the subject of negotiations between the carriers as well as state regulatory jurisdiction."

NPRM, *Equal Access and Interconnection obligations pertaining to Commercial Mobile Radio Services,* 1994 WL 664207, 9 FCC Rcd. 5408, at ¶ 108 (1994) (*"Equal Access NPRM "*) (quoting *Efficient Use Policy Statement,* at 1284–85).

In 1993, Congress amended the 1934 Act as part of the Omnibus Reconciliation Act ("the Budget Act"), Pub.L. No. 103–66, 107 Stat. 312 § 6002 (1993), by adding 47 U.S.C. § 332(c)(1)(B), which requires the FCC, upon the reasonable request of a CMRS provider, to order a common carrier to provide interconnection in accordance with the procedures specified in section 201 of the 1934 Act. *See* 47 U.S.C. § 332(c)(1)(B). The Budget Act preempted state regulation of market entry and rates charged by wireless carriers but otherwise expressly preserved state jurisdic-

tion over intrastate wireless carriers, services, and tariffs. *See* 47 U.S.C. § 332(c)(3).

In 1994, the FCC adopted an order implementing section 332 and holding that section 332 did not "limit or expand the [FCC's] authority to order interconnection pursuant to the [1934] Act." *Section 332 Implementation Order*, at *60, 9 FCC Rcd. at ¶ 220. The FCC reiterated its prior requirement that carriers enter into interconnection agreements providing for mutual compensation. *Id.* at *62, 63, 9 FCC Rcd. at ¶¶ 229, 232. The FCC also required LECs to "establish reasonable charges for interstate interconnection provided to [CMRS] licensees." *Id.* at *63, 9 FCC Rcd. at ¶ 233. Again, the FCC refused "to preempt state regulation of LEC intrastate interconnection rates." *Id.* at *63, 9 FCC Rcd. at ¶ 231.

Qwest argues that it has *no obligation* to pay INS "access" charges or other compensation for intraMTA calls originated by customers of third-party CMRS providers. Qwest characterizes the thrust of INS' claims before the Board and this Court is that Qwest is acting as an interexchange, i.e., long distance, carrier providing interexchange service, and that INS may therefore collect from Qwest tariffed "access" charges applicable to such carriers and service. *See* INS Complaint, ¶ 19 (Qwest's 'transit' service is an interexchange service); *IUB Proposed Decision*, at 13 (describing INS' argument). In particular, INS contends that the FCC's ruling that intraMTA wireless calls are "local" applies only where the originating CMRS provider and the terminating LEC are "directly" connected. *IUB Proposed Decision*, at 11 (describing INS' argument).

As delineated above, the Board found access charges inapplicable to the traffic at issue based on its prior determination that said traffic was "local." As a result, the Board ruled Qwest was not liable for ac-

cess charges after it gave notice to INS that it was no longer paying such charges in April 1999. The Court finds the Board's determination that Qwest is not required to pay access charges, and that access charges are not even available, is entirely consistent with federal law. Since the traffic at issue is classified as "local", access charges are no longer available under the 1996 Act and the FCC's interpretive and implementing decisions.

### 2. Applicability of Reciprocal Compensation Rules

In finding access charges are no longer available for the type of traffic in dispute here, i.e., "local" traffic, the Court assesses whether the Board erred in determining reciprocal compensation did apply. The first key issue is to whom do the reciprocal compensation rules apply. INS asserts it is the two carriers at each end of the call, i.e., the originating carrier and the terminating carrier, whose rates are governed by the reciprocal compensation rules. INS then asserts that charges of intermediary carriers such as INS are not governed by the reciprocal compensation rules or any other rules adopted pursuant to the 1996 Act, and the ability to collect access charges is therefore not displaced.

#### a. Transiting Carriers

INS bases its contentions that the reciprocal compensation rules do not apply to transiting carriers on the *Local Competition Order*, which defines reciprocal compensation arrangements as involving "two carriers" who charge each other to terminate calls originated by the other. *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. Specifically, the rule adopted in the *Local Competition Order* states as follows:

> a reciprocal compensation arrangement between two carriers is one in which each of the two carriers receive compensation from the other for the transporta-

tion and termination on each carrier's network of telecommunications traffic that originates on the facilities of the other carrier.

47 C.F.R. § 51.701(e). Under the rules, the originating carrier pays the terminating carrier. The originating carrier is the carrier that provides local telephone service (by radio or wire) to the calling party, while the terminating carrier is the carrier that provides local telephone service to the called party. *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046; *Texcom Reconsideration Order*, at *2, 17 FCC Rcd. at ¶ 4.

According to INS, the FCC has applied Rule 51.701(e) several times since 1996, holding each time that compensation to intermediary (also known as "transiting" carriers) is *not* governed by the reciprocal compensation rules. *See, e.g., Texcom Reconsideration Order*, at *2, 17 FCC Rcd. at ¶ 4 (refusing to apply the reciprocal compensation rules to limit charges of a transiting carrier, explaining "our reciprocal compensation rules do not provide for such compensation to a transiting carrier. Our rules provide a mechanism for the terminating carrier . . . to recover from originating carriers"); *Mountain Communications, Inc. v. Qwest Communications Int'l, Inc.*, Order on Review, 2002 WL 1677642, at *1, 17 FCC Rcd. 15135, at ¶ 3 (2002) ("*Mountain Communications*") (finding the transiting carrier, "*because* it is not a terminating carrier, could not recover reciprocal compensation payments for transiting traffic").[38]

INS asserts the FCC's decision to limit the reciprocal compensation rules to the carriers which originate and terminate the calls makes sense for both textual and competition policy reasons. From a textual perspective, Rule 51.701(e) is one of at least nine references in the reciprocal compensation rules to those rules governing "two carriers" or "both carriers", *see* 47 C.F.R. §§ 51.701(c) and (e), 51.705(b), 51.709(b), 51.711(a)(2) and (b), 51.713(a), thus excluding additional carriers that are added as intermediaries.[39] Even the definition of a reciprocal relationship is one involving two parties. *Blacks Law Dictionary*, 6th ed. 1990 ("Reciprocal—Given or owed mutually as between two persons; interchanged. Reciprocal obligations are those due from one person to another and vice versa"); *see also* 47 U.S.C. § 251(b) (referring to "reciprocal" compensation).

From a policy perspective, INS states that, as this Court noted in an earlier ruling in this case, the Telecommunications Act of 1996 "was intended to jump-start

---

38. Another aspect of the *Mountain Communications* decision (concerning wide area calling) was vacated by the D.C. Circuit on appeal. In the oral argument on the transiting charges, the transiting carrier (Qwest) agreed to provide billing information to the terminating carrier so the terminating carrier could bill the originating carrier, thereby prompting the terminating carrier which had been billed charges for transiting services to withdraw its appeal as to the transiting issue. *See Mountain Communications, Inc. v. FCC*, 355 F.3d 644, 649 (D.C.Cir.2004).

39. INS asserts in a footnote that based on the references to two carriers, "the FCC went too far and departed from its own rules in *Texcom* and *Mountain Communications* in apply-

ing the reciprocal compensation rules at all to multi-carrier arrangements." INS contends that the reference to "the interconnection point between the two carriers," 47 C.F.R. § 51.701(c), must mean "directly between," and that the FCC itself contrasted two-carrier reciprocal compensation arrangements with multi-carrier arrangements involving access charges. *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. INS does state, however, that because it is an intermediary carrier and the rural ILECs who are terminating carriers are not parties to this lawsuit, the Court will likely not need to reach this issue. INS does state though that this is an additional reason supporting INS' right to enforce its tariffs.

competition in the market for local telephone service." *INS v. Qwest I*, 2002 WL 31296324, at *4–5; *see also Southwestern Bell Tel. Co. v. Connect Communications Corp.*, 225 F.3d at 944. It is the originating and terminating companies that are providing local phone service and own the cell towers, local phone switches, telephone poles, and wire necessary to provide such service. There is no way to reach the end user except through his or her chosen local telephone company be it wireless or landline.[40] *See In the Matter of Access Charge Reform; Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, 2001 WL 435698, at *8, 16 FCC Rcd. 9923, at ¶ 30 (2001) (finding that once an end user selects a local telephone company, any carrier trying to get a call through to that end user must deal with the local telephone company, which controls the "bottleneck" to that end user). By contrast, transiting carriers are in the business of carrying large quantities of calls between telephone switches owned by the originating and terminating carriers. INS asserts that because they are not providing the local telephone service, have no control over the end-user customer, and are hired when their services are economical and convenient, different regulations are called for.

Subsequent FCC decisions considered the rights and obligations of transiting carriers under the 1996 Act and the *Local Competition Order*. In discussing "types of local LEC–CMRS interconnection" in an NPRM on intercarrier compensation, the FCC explained that "in rural settings, wireless carriers can elect to deliver CMRS-originated calls to a large ILEC for routing to the rural LEC carrier." *Intercarrier Compensation NPRM*, 1996 WL 452885, 11 FCC Rcd. at ¶ 91.

In a separate case, the FCC provided the following in determining the application of its transport and termination rules to transiting:

> Currently, our rules in this area follow the cost causation principle of allocating the cost of delivering traffic to the carriers responsible for the traffic, and ultimately their customers. Thus, through reciprocal compensation payments, the cost of delivering LEC-originated traffic is borne by the persons responsible for those calls, the LEC's customers. As we stated in the *Local Competition Order*, "[t]he local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call." . . . In the case of third-party originated traffic, however, the only relationship between the LEC's customers and the call is the fact that the call traverses the LEC's network on its way to the terminating carrier. Where the LEC's customers do not generate the traffic at issue, those customers should not bear the cost of delivering that traffic from a CLEC's network to that of a CMRS carrier like Answer Indiana. Thus, the originating third-party carrier's customers pay for the cost of delivering their calls to the LEC, while the terminating CMRS carrier's customers pay for the cost of transporting that traffic from the LEC's network to their network.

*Texcom Order*, at *2, 16 FCC Rcd. at ¶ 6; *see also Texcom Reconsideration Order*, at *2, 17 FCC Rcd. at ¶ 4.[41]

---

**40.** *See Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046 (finding that wireless carriers provide "telephone exchange service", a/k/a/ local telephone service, although by statute they are excluded from the definition of local exchange carrier).

**41.** In the *Texcom* case, at issue were intraMTA calls that originated on the networks of third-party carriers, transited the network of Defendant GTE North ("GTE"), and terminated on the network of Complainant Answer Indiana, a CMRS provider. *Texcom Order*,

On reconsideration of this decision, the FCC reiterated that a transiting carrier "may charge a terminating carrier for the portion of facilities used to deliver transiting traffic to the terminating carrier .... and [the terminating carrier] may seek reimbursement of these costs form originating carriers through reciprocal compensation." *Texcom Reconsideration Order*, at *2, 17 FCC Rcd. at ¶ 4 (citing 47 U.S.C. § 251(b)(5), 47 C.F.R. § 51.702). The FCC also noted that "carriers are free to negotiate different arrangements for the costs associated with indirect interconnection." *Id.* (citing 47 U.S.C. § 252(a)(1)).

The FCC's Common Carrier Bureau ("the Bureau") also considered "the appropriate compensation mechanism for calls that originate on the network of a third-party LEC and terminate to an AT & T customer" during an arbitration of interconnection agreements done by the Bureau in lieu of the Virginia commission.[42] *Verizon Virginia Order*, at *154, 17 FCC Rcd. at ¶ 541. AT & T, the terminating carrier, proposed that Verizon, as the transiting carrier, treat all calls as Verizon's own and compensate AT & T accordingly. *Id.* The Bureau rejected this proposal, finding that "when a third-party LEC places a call that terminates to [an AT & T customer], AT & T must bill the third-party LEC directly" when traffic originated by third-party carriers "transits the network of an incumbent or other carrier, such as Verizon." *Id.* at *155 and n. 1807, 17 FCC Rcd. at ¶ 544 and n. 1807 (citing the *Texcom* decisions).

In another section 252(e)(5) arbitration, the Bureau held the transiting carrier was not responsible for paying compensation to the terminating carrier except as to calls for which the former failed to provide the latter call identification information passed by the originating carrier. *See Cavalier*, at *11–12, 18 FCC Rcd. at ¶¶ 40–42. The Bureau did hold, however, that the transiting carrier was not required to alter its systems to develop information that was not transmitted to it by the originating carrier. *Id.* at *12, 18 FCC Rcd. at ¶ 42.

INS asserts the FCC has acknowledged the right of the transiting carrier to charge for its services outside the reciprocal compensation system, *see Texcom Reconsideration Order*, at *2, 17 FCC Rcd. at ¶ 4; *Mountain Communications*, at *1, 17 FCC Rcd. at ¶ 2, though at issue is which rules govern. INS asserts the FCC has also responded to this issue by observing it has not adopted any specific rules governing transiting carrier charges, and that therefore transiting carriers have flexibility on structuring their charges. *Verizon Virginia Order*, at *35, 17 FCC Rcd. at ¶ 115 ("Given the absence of Commission rules specifically governing transit service rates, we decline to find that Verizon's additional charges are unreasonable.").

INS argues that the lack of restrictions alone defeats Qwest's arguments that INS is charging in violation of FCC rules. Due to the lack of any regulatory barrier, INS urges the Court to simply enforce the tariffs accepted by the regulator.

In addition, INS contends that the FCC's failure to adopt new rules governing the charges of transiting carriers validates INS' charges in an additional man-

2001 WL 1504282, at *1, 16 FCC Rcd. at ¶ 1. Answer Indiana's formal complaint to the FCC alleged that GTE's attempts to recover from it costs incurred to deliver the calls were unlawful. *Id.* at *1, 16 FCC Rcd. at ¶ 3. The FCC denied Answer Indiana's complaint. *Id.* at *2, 16 FCC Rcd. at ¶ 6.

42. The state commission for Virginia had declined to conduct the arbitration. *Verizon Virginia Order*, at *1, 17 FCC Rcd. at ¶ 1. In that circumstance, the 1996 Act requires the FCC to conduct the arbitration. *See* 47 U.S.C. § 252(e)(5).

ner. In 1996, Congress provided for the continuation of pre-existing charging systems until "explicitly superceded" by subsequent FCC action. 47 U.S.C. § 251(g); *CompTel*, 117 F.3d at 1072. As of the enactment of the 1996 Act, and for three years thereafter, Qwest was paying INS for the traffic at issue, pursuant to INS access tariffs, and had been doing so since the 1980s. *INS v. Qwest II*, 363 F.3d at 687. While Section 251(g) explicitly carries forward pre-existing rules only as to interstate services, INS asserts the FCC concluded Congress intended to carry forward pre-existing rules for intrastate services as well in any situation in which interstate rules are carried forward. *See ISP Remand Order*, at *13, n. 66, 16 FCC Rcd. at ¶ 37 n. 66.[43] INS argues that as a consequence of the carry forward rule and the FCC's determination it extends to intrastate traffic, Qwest's obligation to pay the charges set forth in INS' access tariffs remain in place, and the obligation only ceases when the FCC supercedes that duty or Qwest ceases using INS' services, neither of which have occurred.

INS points out that Qwest successfully advocated this conclusion in the *Mountain Communications* case, *see* Brief to the FCC, *Mountain Communications*, at *1 and n. 11, 17 FCC Rcd. at 5 and n. 11 ("The Commission's reciprocal compensation rules specifically address a two-carrier scenario.... Transit charges, like many other lawful charges authorized by state law, were left intact by the Act."), and that the IUB agreed INS could charge for transiting services, but mistakenly concluded that the reciprocal compensation rules changed the terms under which INS could impose those charges. *In re Exchange of Transit Traffic, Order Affirming Proposed Decision and Order*, Docket SPU–00–7, at 2 (Iowa Utils.Bd. March 18, 2002) ("*Order Affirming Proposed Decision*").

Qwest counters INS' claim that the Board's determination runs counter to the FCC's refusal to adopt specific rules governing transiting carrier charges is foreclosed by numerous FCC decisions. Specifically, Qwest asserts that the FCC's decisions hold uniformly that transiting

**43.** In the *ISP Remand Order*, the FCC explained that Congress must have intended to exclude from Section 251(b)(5) reciprocal compensation any intrastate traffic that would be explicitly excluded under Section 251(g) if it were interstate. The FCC reasoned that it would be "incongruous" to have the reciprocal compensation rules cause more of a "disruption" at the intrastate level, where the FCC has historically had less authority, than at the interstate level:

Although section 251(g) does not itself compel [carrying forward preexisting access charge regimes] with respect to intrastate access regimes (because it expressly preserves only the *Commission's* traditional policies and authority over interstate access services), it nevertheless highlights an ambiguity in the scope of "telecommunications" subject to section 251(b)(5)—demonstrating that this term must be construed in light of other provisions in the statute. In this regard, we again conclude that it is reasonable to interpret section 251(b)(5) to exclude traffic subject to parallel intrastate access regulations, because it would be incongruous to conclude that Congress was concerned about the effects of potential disruption to the interstate access charge system but had no such concerns about the effects of analogous intrastate mechanisms. *ISP Remand Order*, 2001 WL 455869, at *13, n. 66, 16 FCC Rcd. 9151, at ¶ 37, n. 66 (internal quotations and citations omitted). Also, in the *ISP Remand Order*, the FCC cited its previous ruling in the *Local Competition Order* that the carry-forward concept in Section 251(g) should apply to intrastate as well as interstate traffic. *Id.* (citing *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046 (relying on the Commission's powers under Section 4(i) of the Communications Act, 47 U.S.C. § 154(i), to make all orders necessary and proper in carrying out its functions and 47 U.S.C. § 251(d)(1))).

carriers are not required to pay compensation to other carriers for their handling of intraMTA calls placed by customers of other carriers.

Moreover, Qwest asserts INS misreads the FCC decisions it relies on, as the results in those disputes would have been much different if INS' position were correct. *See, e.g., Texcom Inc. v. Bell Atlantic Corp.,* 2001 WL 1504282, 16 FCC Rcd. 21493 (2001) and *Texcom Inc. v. Bell Atlantic Corp.,* 2002 WL 459938, 17 FCC Rcd. 6275 (2002) (collectively *"Texcom"*) (terminating carrier Answer Indiana compensated the transiting carrier GTE rather than transiting carrier paying access charges or other compensation to the terminating carrier); *Mountain Communications, Inc. v. Qwest Communications Int'l, Inc.,* 2002 WL 130892, at *2–3, 17 FCC Rcd. 2091, at ¶¶ 8–10 (FCC Common Carrier Bureau) (*"Mountain Bureau Order"*) and *Mountain Communications,* at *1, 17 FCC Rcd. at ¶¶ 2–3, *aff'd in part and rev'd in part on other grounds,* 355 F.3d 644, 649 (D.C.Cir.2004) (terminating carrier compensated the transiting carrier Qwest rather than transiting carrier paying access charges or other compensation to the terminating carrier);[44] *Verizon Virginia Order,* at *34, 36, 154, 17 FCC Rcd. at

¶¶ 114, 119, 541 (originating or terminating carriers, AT & T and MCI, compensated the transiting carrier Verizon and established its own billing arrangements rather than transiting carrier paying access charges or other compensation to the terminating carrier); *Intercarrier Compensation NPRM,* 1996 WL 452885, 11 FCC Rcd. at ¶ 6 [45] (identifying transiting carrier as ILEC rather than IXC and declaring lawful the refusal of the transiting carrier to bill the originating CMRS provider on behalf of the rural LEC).

Qwest notes that INS does not dispute that the FCC and its Wireline Competition Bureau have held or recognized that transiting carriers have no federal law obligation to pay access charges or other compensation to other carriers for their handling of intraMTA calls placed by end-user customers of third-party CMRS providers. Instead, Qwest contends INS engages in a collateral attack of the FCC decisions by claiming the FCC "went too far and departed from its own rules in *Texcom* and *Mountain Communications* " on the applicability of "reciprocal compensation" to "multicarrier arrangements." Qwest argues that even assuming *arguendo* that such a collateral attack were permissible,[46] the rationale in the FCC's transiting decisions does *not* contradict the

---

**44.** INS observes that "Qwest agreed at oral argument" before the D.C. Circuit "to provide to the terminating carrier billing information so that the terminating carrier could bill the originat[ing] carrier." Qwest asserts that the evidence indicates that Qwest has at all times offered to provide such evidence to INS.

**45.** According to Qwest, the passages of the *Intercarrier Compensation NPRM* cited and discussed reflect the FCC's understanding of current law as the FCC has yet to adopt new or different rules in its docket.

**46.** Under the Hobbs Act, 28 U.S.C. § 2342, jurisdiction to review decisions of the FCC is exclusive in the Courts of Appeal. *See, e.g., U.S. West Communications, Inc. v. Hamilton,* 224 F.3d 1049, 1054–55 (9th Cir.2000), *amended by,* 2000 U.S.App. LEXIS 26417 (9th

Cir. Oct. 23, 2000); *Wilson v. A.H. Belo Corp.,* 87 F.3d 393, 398–400 (9th Cir.1996); *City of Peoria v. General Elec. Cablevision Corp.,* 690 F.2d 116, 120 (7th Cir.1982). Statutory provisions such as the Hobbs Act that vest exclusive jurisdiction in the appellate courts to review agency orders bar collateral attacks by nonparties as well as parties to the agency proceeding. *See City of Peoria,* 690 F.2d at 120 (explaining that nonparty may set up a challenge by initiating a proceeding before the agency). "A challenge to an [agency] order need not be direct" to invoke these statutory provisions; "all that is required is that the effect of the prayed for relief contradict a Commission order." *Victor Oolitic Stone Co. v. CSX Transp., Inc.,* 852 F.Supp. 721, 723 (S.D.Ind.1994). Further, the Hobbs Act bars collateral attacks to FCC decisions in either rulemakings, adjudications, or proceed-

results in those decisions and does not support INS' Complaint against Qwest.

In particular, Qwest asserts the FCC's decisions that transiting carriers may seek compensation from terminating carriers is entirely consistent with the "cost causation" principles that underlie the FCC's current intercarrier compensation rules. *Texcom Order*, 2001 WL 1504282, at * 2, 16 FCC Rcd. at ¶ 6. Correspondingly, Qwest argues it is entirely inconsistent with the intercarrier compensation rules, with the underlying cost causation principles, to impose a compensation obligation on a transiting carrier as INS seeks to do

here. *Compare Texcom Order*, 2001 WL 1504282, at * 2, 16 FCC Rcd. at ¶ 6 ("Where the ILECs [i.e., the transiting carrier] customers do not generate the traffic at issue, those customers should not bear the cost of delivering that traffic . . . ."), *with IUB Proposed Decision*, at 13 (finding INS' argument that Qwest is the carrier required by the *Local Competition Order* to compensate INS "is not applicable to a carrier in the position that Qwest occupies in this case, where is has no end-user customer in the transaction who can be billed for the costs Qwest incurs to complete these calls").[47]

---

ings for declaratory relief. *See, e.g., Wilson,* 87 F.3d at 398.

Qwest notes that even if the Hobbs Act did not bar INS' collateral attack on the transiting decisions of the FCC and the Bureau, those decisions would nevertheless be entitled to substantial deference. *See Indiana Bell Tel. Co. v. McCarty,* 362 F.3d 378, 386–87 (7th Cir.2004) (recognizing that Bureau decision in *Verizon Virginia Order* "require deference as the voice of the FCC interpreting its own rules") (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *MCImetro Access Transmission Servs., Inc. v. BellSouth Telecomm., Inc.,* 352 F.3d 872, 880 n. 8 (4th Cir.2003) (rejecting argument that Bureau decision in *Verizon Virginia Order* "should not be given the deference we normally give decisions by the FCC").

Meanwhile, INS argues that its arguments do not constitute a collateral attack and that it does not seek to overturn prior FCC decisions. The point of INS' discussion was not that those decisions should be invalidated, as those decisions actually confirm INS' assertion that the FCC has not applied reciprocal compensation rules to the charges of transiting carriers. To the contrary, INS claims its comment was merely made to highlight that it seemed incongruous that the FCC would apply its reciprocal compensation rules to the originating and terminating carriers in a multicarrier situation when reciprocal compensation generally does not apply in such situations.

According to INS, while the FCC's rules provide that "a reciprocal compensation ar-

rangement *between two carriers* is one in which each of the *two carriers* receives compensation from the other carrier," and there is an "interconnection *between the two carriers*," 47 C.F.R. § 51.701(c) and (e) (emphasis added), the fact remains that the FCC has acknowledged the right of transiting carriers to charge for its services outside the reciprocal compensation system. *See* discussion *infra,* at Analysis Section E.2. In the instant case, INS contends such charges are in the form of access charges as set forth in its federal tariff. Further, INS reiterates its contentions that even terminating carriers are not governed by the reciprocal compensation rules where the IXC exception applies. *See* discussion *infra,* at Analysis Section D.4.

47. Qwest further argues that the FCC's statement in *Texcom* that its reciprocal compensation rules do not authorize recovery by the transiting carrier from the originating carrier provides no support for a claim against another transiting carrier, as opposed to the terminating carrier. Additionally, the FCC has expressly acknowledged that carriers involved in the handling of the call are free to work out different compensation arrangements. *Texcom Reconsideration Order,* at *2 n. 12, 17 FCC Rcd. at ¶ 4 n. 12. Qwest argues that in the present case, the CMRS carriers that originated the calls at issue do not object to entering into interconnection agreements pursuant to which they compensate transiting carriers, as confirmed by their payments to Qwest of such compensation for the use of Qwest's network, the absence in the record before the Board of any objection by them to

Qwest also contends that the IUB correctly interpreted the Act and the FCC decisions applying the Act and counters that INS' proposed interpretation would result in massive increases in costs incurred by CMRS providers and the resulting increased cost to providers. Specifically, Qwest contends that if INS' argument were correct, CMRS providers would either need to build up their network infrastructure in order to interconnect directly with many terminating ILECs [48] or interconnect indirectly with and pay to the terminating LECs non-cost based access charges averaging about 9.2 cents per minute ("cpm"). In contrast, Qwest asserts cost-based reciprocal compensation would average approximately 1 cpm. Qwest maintains that the resulting costs, many of which would be passed to consumers, is the very result the FCC sought to avoid in the *Local Competition Order* and is contrary to the policy driving the 1996 Act, i.e., fostering competition in the local and wireless markets. While these factually based issues cannot be resolved in the current posture of the case, the argument illustrates the essential thrust of the emerging law in this area.

Even if the FCC had not determined which carrier in multicarrier arrangements is obligated to compensate transiting carriers, that would not mean the Board's determination that Qwest has no obligation to compensate INS for the calls at issue violates federal law. The FCC has itself held that where it has not clearly resolved a section 251 issue underlying a "carrier-to-carrier dispute", the state commission is authorized to resolve it subject to federal court review to ensure the chosen resolution is not inconsistent with federal law. Memorandum Opinion and Order, *Application by Qwest Communications International, Inc. for Authorization To provide In–Region, InterLATA Services in the States of Colorado, Idaho, Iowa, Montana, Nebraska, North Dakota, Utah, Washington and Wyoming*, 2002 WL 31863801, at 89, 17 FCC Rcd. 26303, at ¶ 325 (2002) ("*Qwest Application* "). As discussed *supra*, Qwest argues the Board's resolution of the dispute between Qwest and INS, which results from the decision of the CMRS carriers to exercise their rights under 47 U.S.C. § 251(a) to interconnect "indirectly" with the terminating LECs, is in no way inconsistent with federal law.[49] Qwest asserts the Board's authority to resolve these disputes is even clearer here as the traffic at issue is exclusively intrastate and local.[50] *INS v. Qwest I*, 2002 WL 31296324, at *7 (recognizing "the IUB has jurisdiction over telecommunications services provided inside the state of Iowa, as long as the Board does not act in a manner inconsistent with the Act or FCC regula-

such arrangements, and the fact they did not appeal the Board's decision.

**48.** Including more than one hundred terminating ILECs in Iowa alone.

**49.** Contrary to INS' assertion, Qwest contends the Bureau did not state or imply in the *Verizon Virginia Order* that because the FCC had not adopted any "specific rules governing transiting carrier rates," *Verizon Virginia Order*, at *35, 17 FCC Rcd. at ¶ 115, that such carriers therefore have flexibility to unilaterally impose a compensation obligation on another carrier that neither originated or termi-

nated the call. In fact, Qwest points out that the Bureau held that a transiting carrier had no such compensation obligation, and the statement relied on by INS concerned the level of "rates" that could be assessed by the transiting carrier on the originating or terminating carrier. *Id.*

**50.** Qwest asserts the "relatively insubstantial" amount of interstate, intraMTA traffic terminated by INS' ILEC owners is likewise subject to the Board's jurisdiction. *See Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046.

tions") (citing 47 U.S.C. § § 253(b), 261); *see also* 47 U.S.C. §§ 251(d)(3), 252(e)(3).

While INS acknowledges the FCC decision in the *Verizon Virginia Order* that a transiting carrier is not required to compensate a terminating carrier, INS points out that it is a transiting carrier, not a terminating carrier, and therefore the *Verizon Virginia Order* has dubious applicability to the situation here. In addition, INS contends Qwest overlooks a subsequent decision by the same FCC Common Carrier Bureau [51] in which the Bureau distinguished this earlier decision and ordered a transiting carrier to pay access charges to a terminating carrier where the transiting carrier failed to pass on available information that would allow the terminating carrier to bill the originating carriers. *Cavalier*, at *11 and n. 148, 18 FCC Rcd. at ¶ 40 and n. 148.

In *Cavalier*, the Bureau required the transiting carrier to pass on to the terminating carrier all information it has regarding the originating carriers. *Id.* As long as the transiting carrier fulfilled its obligation to pass on available billing information, the terminating carrier was to bill the originating carriers at reciprocal compensation rates. *Id.* at *12–14, 18 FCC Rcd. at ¶ 42–43. Failure to pass on the information would, however, result in the transiting carrier being charged higher access rates for the termination of the unidentified traffic. *Id.* INS contends the Bureau's *Cavalier* decision confirms a key point in INS' arguments, that is, the reciprocal compensation rules may (absent the IXC exception) govern the charges imposed by the *terminating carrier* on the *originating wireless carrier* for an intraMTA call, but they do not govern charges imposed on or by *transiting carriers* such as Qwest and INS.

INS also asserts the result in *Cavalier* and the earlier decisions in *Texcom* and *Mountain Communications* underscore the fallacy in Qwest's argument that the FCC has adopted rigid rules governing the rights and duties of transiting carriers. INS contends these decisions demonstrate the flexibility and absence of restrictive rules and, as indicated by the decisions, transiting carriers are permitted to charge the originating carrier, the terminating carriers, can sometimes be charged by the terminating carrier, and generally operate in an environment in which general rules have not been set. *See Mountain Communications*, 2002 WL 1677642, at *1, 17 FCC Rcd. 15135, at ¶ 2; *Verizon Virginia Order*, at *35, 17 FCC Rcd. at ¶¶ 115–17; *Cavalier*, at *12–14, 18 FCC Rcd. at ¶ 43. INS asserts its tariff is therefore permissible as discussed in more detail *infra*.

INS asserts that the Communications Act provision that governs the interconnection obligations of INS as an ordinary nonincumbent LEC confirms this flexibility as it provides INS "has the duty ... to interconnect directly *or* indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1) (emphasis added). The FCC has explained that the disjunctive in this section gives the carrier providing interconnection the choice to interconnect directly or indirectly, and that it can make the decision "based upon [its] most efficient technical and economic choices." *Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. INS asserts commingling of traffic is an example of a technical and efficiency consideration that supports a decision to hold the directly connecting carrier, in this case Qwest, responsible for payment.

Qwest counters INS' assertions with regard to the *Cavalier* decision by claiming there is no merit to INS' contention that

**51.** Since renamed the Wireline Competition Bureau.

its approach is fundamentally the same as that taken by the FCC in *Cavalier*. To the contrary, Qwest asserts the Bureau's approach is more akin to that taken by the Board in this case.

Qwest first points out that *Cavalier* involved arbitration of an interconnection agreement following the failure of the parties negotiations. *Cavalier*, at *1, 18 FCC Rcd. at ¶ 1. The existing dispute concerned the obligations of the transiting carrier to provide information to facilitate billing of the third-party originating carriers where local and long distance calls are delivered over the same trunk group. *Id.* Qwest asserts this is precisely the issue here, and that the Board appropriately suggested negotiation, with arbitration an option if those negotiations failed, much like what occurred in *Cavalier*. *See IUB Proposed Decision*, at 30 and n. 5.[52]

Qwest further disputes INS' contention that the decision *of the CMRS providers* to interconnect indirectly with INS somehow allows INS to collect from *Qwest* access charges or other compensation. Qwest argues that contrary to INS' claim, the *Local Competition Order* does not grant INS the right to unilaterally decide the type of interconnection with CMRS providers, and that in any case, "indirect interconnection (e.g., two non-incumbent LECs intercon-

necting with an incumbent LEC's network) satisfies a telecommunication carrier's duty to interconnect pursuant to section 251(a)." *See Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046;[53] see also Efficient Use Policy Statement*, at ¶ 3 (noting that the FCC had agreed that "cellular carriers" should be permitted to choose the type of interconnection); *Section 332 Implementation Order*, at *63, 9 FCC Rcd. at ¶ 230 (finding it "in the public interest to require LECs to provide the type of interconnection reasonably requested by all CMRS providers").

### b. Intermediary Carriers and the Further NPRM

On March 3, 2005, the FCC released its *Further Notice of Proposed Rulemaking in the Matter of Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01–92, FCC 05–33 (Mar. 3, 2005) ("*Further NPRM*"). In this notice of proposed rulemaking, the FCC discusses intermediary carriers and the reciprocal compensation rules, and while such a notice is a proposal to adopt a rule of prospective applicability rather than a binding order, the FCC's discussion is still pertinent.[54]

In the *Further NPRM*, the FCC observes that it has not adopted rules gov-

---

**52.** Qwest contends the Board grounded its decision on both 47 U.S.C. § 252 and state law. *IUB Proposed Decision*, at 30 n. 5.

**53.** In fact, the thrust of the *Local Competition Order* in general, and the sections on LEC–CMRS interconnection in particular, was to protect or expand the rights of CMRS providers in their dealings with incumbent LECs and other carriers with "market power." *See, e.g., Local Competition Order*, at *302–305, 11 FCC Rcd. at ¶¶ 1035–1046. Thus, Qwest asserts that a rule permitting wireline carriers to dictate the type of interconnection with CMRS providers would have been a radical departure from prior law that the FCC would have acknowledged.

**54.** The rulemaking proceeding is on a slow track that commenced in 2001 and has just now reached the stage of publishing a menu of alternative proposals for new rules (but not yet specific rule text) and seeking comment on them from the industry and other affected parties. Given the lengthy comment period (running 90 days following publication in the Federal Register), the time required to analyze the voluminous comments likely to be received, and the overall slow pace of this rulemaking proceeding, the Court should not anticipate that a decision will be issued until sometime in 2006, at the earliest. Even then the results of that decision would only affect calls carried after the new rules, if any, are adopted and go into effect.

erning the charges of intermediary, i.e., transiting carriers. The FCC states the following:

> The reciprocal compensation provisions of the Act address the exchange of traffic between an originating carrier and a terminating carrier, but the Commission's reciprocal compensation rules do not directly address the intercarrier compensation to be paid to the transit service provider.

*Further NPRM*, at *34, 20 FCC Rcd. at ¶ 120. The FCC states further,

> If rules regarding transit service are warranted, we seek comment on the scope of such regulation. Specifically, we seek comment on whether transit service obligations under the Act should extend solely to the incumbent LECs or to all transit service providers, including competitive LECs.

*Further NPRM*, at *37, 20 FCC Rcd. at ¶ 130. And additionally,

> [W]e seek further comment on the appropriate pricing methodology, including the possibility of requiring that transit service be offered at the same rates, terms, and conditions as the incumbent LEC offers for equivalent exchange access services (e.g., tandem switching and tandem switched transport) and how this option would be affected by our proposals to alter the current switched access regime.

*Further NPRM*, at *37, 20 FCC Rcd. at ¶ 132. INS asserts this discussion confirms there is no existing rule regulating intermediary carrier (transiting) charges, such as those that INS' federal tariff requires Qwest to pay.

INS argues that the *Further NPRM* also confirms that the FCC has not resolved the separate issue of whether a terminating local carrier should charge access charges or reciprocal compensation when it terminates intraMTA wireless-originated calls that transit the network of a Bell Company such as Qwest. *See Further NPRM*, at *39, 20 FCC Rcd. at ¶ 137 ("We also note that carriers have disagreed regarding the meaning of the existing intraMTA rule. Many rural LECs argue that intraMTA traffic between a rural LEC and a CMRS provider must be routed through an IXC and therefore is subject to access charges, rather than reciprocal compensation. CMRS providers, however, argue that all CMRS traffic that originates and terminates within a single MTA is subject to reciprocal compensation. In the event that we retain the rule and interpret its scope in the more limited fashion advocated by the rural LECs, should the rule be changed so that all intraMTA traffic to or from a CMRS provider is subject to reciprocal compensation?") (footnotes omitted); *id.* at *39 n. 392, 20 FCC Rcd. at ¶ 137 n. 392 (describing the rural LEC position that the transit carrier acts as an interexchange carrier (IXC) in the case of traffic "to or from" a wireless carrier).

Qwest, on the other hand, contends the *Further NPRM* provides no support for INS' claims. Qwest points out that the *Further NPRM* states only that the FCC has "not adopted rules" governing the charges of transiting carriers, and "not resolved" other issues. Qwest asserts that what INS continues to miss is that the Iowa Utilities Board *has* resolved these issues in Iowa, consistent with the Board's role under the 1996 Act and the FCC's pre-Act decisions. Qwest contends that the Board's decisions are thus substantive law that must be applied to the merits of the parties' dispute, unless INS is able to show the Board's decision *violates* federal law.[55]

---

55. Qwest notes that it is not arguing here for application of the principle of either claim or issue preclusion; rather, the Court should

Qwest further argues that the theory underlying INS' Complaint, i.e., that in the absence of FCC rulings it may resolve unilaterally disputes regarding rates, terms, and conditions for its transport of intraMTA calls, is simply false. Qwest reiterates that FCC decisions have consistently held that disputes within a state regarding the rates, terms, and conditions applicable to LEC–CMRS interconnection (including the transport and termination of intrastate wireless calls) are to be resolved by the state commission, except to the extent the state's decisions conflict with FCC regulations.[56] *See* Declaratory Ruling, *Efficient Use of Spectrum,* at \*14, 2 FCC Rcd. at ¶¶ 54–56 (holding intercarrier compensation arrangements for wireless traffic are to be established in interconnection agreements between the parties); *Equal Access NPRM,* at ¶ 108 (finding wireless inter-connection arrangements are "largely a matter of state, not federal concern"); *Section 332 Implementation Order,* at \*63, 9 FCC Rcd. at ¶ 231 (holding the rates for the intrastate component of wireless interconnection agreements is entirely a matter of state concern).

Qwest further underscores its argument by pointing out that in the 1996 Act, Congress expressly authorized state commissions to prescribe regulations to fulfill the requirements of that section of the Act encompassing Sections 251 through 261, *see* 47 U.S.C. § 261(b), and the FCC has held LEC–CMRS interconnection issues are to be addressed under sections 251 and 252. *Local Competition Order,* at \*302–305, 11 FCC Rcd. at ¶¶ 1035–1046. Thereafter, the FCC held that where it has not clearly resolved a section 251 issue, the state commission is authorized to resolve it subject to federal court review, *Qwest Application,* at \*89, 17 FCC Rcd. at ¶ 325,

and the Eighth Circuit has confirmed federal law does not preempt state regulation absent an express declaration to that effect by the FCC. *See Qwest v. Scott,* 380 F.3d 367 (8th Cir.2004). Qwest argues that, *a fortiori,* where the FCC has expressly declined to preempt state regulation of intrastate communications, state commissions retain jurisdiction.

This continuing rulemaking, while not precedent, is a convincing demonstration that the issues now presented are unresolved in the law. Against that backdrop, the essential issue becomes whether the IUB has power and authority to resolve the pending questions, which this Court finds it does, and then whether that resolution conflicts with federal law.

Qwest emphatically argues that ultimately INS' failure to show the Board's resolution of the parties' dispute violates federal law is fatal to its Complaint. Qwest asserts no FCC decision or statement, including the *Further NPRM,* requires a state commission to accept a tariff, or defer to an unauthorized federal tariff filed unilaterally for the purpose of preempting state commission jurisdiction over intrastate traffic.

To the contrary, Qwest points out that the FCC prefers negotiated agreements, as recently reaffirmed in a recent order. *See* Declaratory Ruling Report and Order, *Developing a Unified Intercarrier Compensation Regime, T–Mobile Petition for Declaratory Ruling Regarding Incumbent LEC Wireless Termination Tariffs,* CC Docket No. 01–92, FCC 05–42, 2005 WL 433200 at \*5, 20 FCC Rcd. 4855 at ¶ 14 (FCC Feb. 24, 2005) ("*T–Mobile Wireless Termination Order* "). Qwest also argues that equally important is the acknowledgment in the *Further NPRM* that compen-

consider and reject in the merits any claim by INS that the Board's decision violates federal law.

**56.** *See* discussion *supra,* at section D.1.

sation for the termination of intraMTA is a matter for the originating and terminating carriers, not the transiting carrier. *Further NPRM*, at *38, 20 FCC Rcd. at ¶ 133. Indeed, in a prior NPRM, the FCC emphasized that its "[e]xisting access charge rules and the majority of existing reciprocal compensation agreements require the calling party's carrier, whether LEC, IXC or CMRS, to compensate the called party's carrier for terminating the call." *Intercarrier Compensation NPRM*, 1996 WL 452885, 11 FCC Rcd. at ¶ 6.

Finally, Qwest contends INS misconstrues the statements in the *Further NPRM* pertaining to the intraMTA rule. According to Qwest, the FCC appears to have been referring to circumstances where traffic originating or terminating outside a wireline LEC's local calling "*must* be routed through an IXC." *Further NPRM*, at *39, 20 FCC Rcd. at ¶ 137 (emphasis added). Qwest asserts there is no contention before the Board that the CMRS carriers were required to route the intraMTA calls of their customers through Qwest, and more fundamentally, Qwest reasserts that it was not acting as an IXC serving the end-user customers placing or receiving the calls. In any event, Qwest contends the FCC's statements in its *Further NPRM* suggest some ambiguity in the intraMTA rule as applied to calls for which the intermediate carrier is not acting as an IXC. Qwest asserts the rule is subject to interpretation by state commissions and the federal courts, and Qwest argues that all of those considering the issue have rejected the interpretation offered by INS.

The Court finds the Board did not err in its determination that the reciprocal compensation rules applied to INS and Qwest as related to the traffic at issue. Furthermore, the Court finds this holding is consistent with federal law. Even if that were not true, the Court reiterates that the IUB had the authority under the 1996 Act and administrative regulations to rule with respect to these issues. Given that authority, and the lack of an express declaration by the FCC resolving the issue, demonstrated by the *Further NPRM*, it was well within the Board's power to rule as it did. In other words, in addressing this unresolved area, the IUB could resolve the matter (at least in Iowa) by application of the reciprocal compensation rules. It is the duty of the IUB to resolve such issues within Iowa, and those determinations are binding unless and until the FCC expressly finds otherwise. Accordingly, the Court finds the Board's determination that the reciprocal compensation rules are applicable to the traffic at issue must control the current dispute.

### 3. Negotiation and Arbitration and Section 252 Exclusivity

■ The 1996 Act also establishes a system of negotiations and arbitrations in order to facilitate voluntary agreements between the competing carriers to implement its substantive requirements.[57] Under the 1996 Act, "all local exchange carriers are required to establish reciprocal compensation arrangements in their interconnection agreements." *Id.* at 1119 (quotations and citations omitted). Negotiation is triggered by a carrier making a bona fide request ("BFR") to enter into an interconnection agreement for the exchange of local traffic.[58] 47 U.S.C. § 252(a)(1).

Once negotiations begin, both the ILEC and the other carrier "have a duty to

---

57. This system is similar in structure to that adopted by the FCC prior to passage of the 1996 Act.

58. Though non-ILECs cannot be compelled to negotiate by delivering a BFR because they have no duty to exchange local traffic. *See* 47 U.S.C. § 252(a)(1); *but see* discussion *infra*, at footnote 58.

negotiate in good faith the terms and conditions of an agreement that accomplishes the Act's goals." *Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 792 (8th Cir.1997) (citing 47 U.S.C. §§ 252(c)(1), 252(a)(1)). If the parties fail to reach an agreement through voluntary negotiations, either party may petition the relevant state public utility commission to arbitrate and resolve any open issue. 47 U.S.C. § 252(b). The final agreement, whether negotiated or arbitrated, must be approved by the state commission. *Id.* (citing 47 U.S.C. §§ 252(b), 252(e)(1)).

INS asserts that Qwest's contentions regarding the exclusivity of Section 252 is an attempt to persuade this Court to invalidate a tariff approved by the FCC. INS submits Qwest's exclusivity argument does not relate to the FCC's jurisdiction over intrastate wireless traffic, but rather to the proper procedural mechanism (tariff or contract) for setting the terms and conditions of services within that jurisdiction.

INS concedes that the FCC and courts have declined to rule on the exclusivity of Section 252. *See Global NAPs, Inc. v. FCC,* 247 F.3d 252, 260 (D.C.Cir.2001). However, should the Court consider Qwest's Section 252 exclusivity argument, INS contends the argument fails substantively for four reasons.

First, INS argues that even if Section 252 has an implicit exclusivity provision, then such exclusivity could logically arise only where the Section 252 process is in fact available *and* where the carrier seeking to set its charges is within the class of carriers required to negotiate/arbitrate pursuant to § 252. INS asserts neither condition is met here as neither INS nor Qwest is an ILEC and so cannot be forced to participate in an interconnection negotiation/arbitration.[59] *See Petition for Declaratory Ruling by Alabama's Rural Incumbent Local Exchange Carriers … upholding the applicability of tariff provisions governing compensation for indirect CMRS traffic,* 2004 WL 417312, 2004 Ala. PUC LEXIS 27, 232 P.U.R. 4th 148, *47–53 (Ala.P.S.C. Jan.26, 2004); *State ex rel. Sprint Spectrum L.P. v. Mo. Pub. Serv. Comm'n,* 112 S.W.3d 20, 24–26 (Mo.App. 2003) (affirming state commission).

Second, INS notes in another case involving wireless interconnection traffic, the D.C. Circuit rejected a similar Qwest argument that the Section 252 process is exclusive. *See Qwest Corp. v. FCC,* 252 F.3d 462, 465 (D.C.Cir.2001). In that case, a wireless carrier field a Section 208 complaint with the FCC against Qwest to resolve a dispute involving reciprocal compensation rules. Without deciding whether Section 252 would provide the exclusive means of resolving disputes, the D.C. Circuit held Section 332 provided an independent basis for FCC jurisdiction over all wireless interconnection traffic and thus Section 252 could not be the exclusive procedure to resolve disputes. According to INS, this case affirms use of procedures other than Section 252, such as the Section 204 tariff process invoked by INS here.

Third, INS asserts Section 251(g) preserves the right of intermediary carriers to impose charges as they did prior to the 1996 Act, and the *TSR Wireless Order* confirms that intraMTA wireless originated calls carried by IXCs are subject to access charges.[60] *See In re TSR Wireless, LLC v. U.S. West Communications, Inc.,* 2000 WL 796763, at *11, 15 FCC Rcd. 11166, at ¶ 31 (2000) (*"TSR Wireless Order"*). INS further asserts that even if reciprocal compensation rather than access

---

**59.** *See* discussion *supra,* at section C.2.

**60.** These assertions are discussed more fully *infra,* at section D.4.

charges govern, the INS federal tariffs is crafted as a reciprocal compensation tariff.

Fourth, INS asserts it is not required to show a specific FCC order or regulation authorizing it to file a tariff for wireless interconnection transiting traffic, as the Communications Act states without restriction that LECs "may" file tariffs setting "new or revised charge[s], classification[s], regulation[s], or practice[s]," and provides, without restriction, that such filing "shall become effective" if not suspended or rejected by the FCC within 15 days. 47 U.S.C. § 204(a)(3). Once a tariff is effective, it is deemed lawful, indicating no additional approval is needed. The FCC has adopted rules to ensure that the staff at the FCC are specifically notified of deemed lawful tariff filings under Section 204(a)(3), and so have the opportunity to review the filing before it becomes effective and subject only to prospective invalidation. 47 C.F.R. § 61.33(d); *see also ACS of Anchorage, Inc. v. FCC,* 290 F.3d 403, 411–13 (D.C.Cir.2002) (reviewing differences between deemed lawful tariffs under § 204(a)(3) and other types of tariffs).

Qwest argues that INS is wrong in claiming that because Congress did not *require* in Section 252 entities other than ILECs to negotiate or arbitrate interconnection agreements, it follows the Board's determinations violate federal law. According to Qwest, INS' claim seeks, in substance, to apply the maxim *"expressio unius"* to construe the omission from Section 252 of a requirement that INS submit to a negotiation/arbitration process as a prohibition on that result. Federal courts have held, however, that this maxim "has little force in the administrate setting," *see Mobile Communications Corp. of America v. FCC,* 77 F.3d 1399, 1404–05 (D.C.Cir. 1996) (citing *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 694 (D.C.Cir.1991) (quoting *Chevron v. NRDC,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81

L.Ed.2d 694 (1984))), and Qwest asserts INS has identified no manner in which its participation in the negotiation/arbitration process would defeat the more market-oriented regime that Congress sought through the 1996 Act. In short, Qwest argues that the imposition on INS of a duty to negotiate and arbitrate if necessary is not inconsistent with Section 251 merely because this section does not itself impose such a duty. *See generally MCI Telecomm. Corp. v. New York Tel. Co.,* 134 F.Supp.2d 490, 506 (N.D.N.Y.2001) (finding that state commission order that ILEC provide "superior quality" service not inconsistent with Act's language that service be "at least equal" in quality).

In any case, Qwest contends that this Court need not decide whether the negotiations/arbitration process is "exclusive" where the party seeking compensation is not an ILEC. According to Qwest, the dispositive fact is the tariffs may not be used to establish compensation for LEC–CMRS interconnection for local traffic.

Additionally, Qwest contends that any argument made by INS that CMRS providers have "no incentive to negotiate" is foreclosed by the evidence presented to the Board. *See IUB Proposed Decision,* at 17, 22, 23, 24 (summarizing positions of CMRS providers such as Sprint Wireless, Verizon/US Cellular, and AT & T Wireless who all desired and attempted to negotiate with INS); *see also T–Mobile Wireless Termination Order,* at *5, 20 FCC Rcd. at ¶¶ 15–16 (amending FCC rules to ensure LECs have the same ability to compel negotiations and arbitrations that CMRS providers have under the 1996 Act). Instead, INS appears to have been unimpressed with negotiation, preferring instead to unilaterally establish charges for transport and force Qwest to act as its billing agent.

Likewise, Qwest contends INS' assertions about the burdens on small carriers

associated with proceeding under agreements as opposed to tariffs are contrary to the record before the Board, and have been rejected by the FCC. To alleviate any burden on themselves and INS, the CMRS providers advised the Board of their willingness to negotiate collectively with INS a "generic" or "template" agreement that would apply in all but "special circumstances". *IUB Proposed Decision,* at 17–18, 24. Moreover, the FCC rejected as a matter of law and fact the argument that the burdens on small carriers in using contracts justify the use of tariffs instead. *Policy and Rules Concerning Interstate, Interexchange Marketplace,* 1996 WL 633345, 11 FCC Rcd. 20730, 20764, at ¶ 57 (1996); *see also id.* at ¶ 46 (rejecting argument that increased "transaction costs" incurred to establish contracts with "literally millions" of customers justified the use of tariffs instead).

The Court finds it need not resolve the question of exclusivity raised by the parties. Based on the Court's conclusions that the Board acted within its authority in promoting negotiation/arbitration to reach reciprocal compensation agreements concerning the traffic at issue, and the fact that such determination does not violate federal law, the exclusivity argument becomes a collateral argument. The fact that the Board ruled is sufficient to render negotiation/arbitration the appropriate avenue to resolve the dispute between the parties, even if the Board may have had other remedial paths available.

### 4. IXC Exception

INS also argues that Qwest is acting as an interexchange carrier ("IXC") and is therefore subject to access charges billed even by carriers (including terminating carriers) who arguably would otherwise be limited to seeking reciprocal compensation. Thus, INS contends that even if the Court disagrees with the FCC decisions finding intermediary carriers are not governed by the reciprocal compensation rules, then the IXC exception to the intraMTA is a second reason why INS may collect its tariffed charges and why the FCC reasonably approved INS' tariff amendment.

As detailed above, the Court has already determined that Qwest is not an IXC with respect to the traffic at issue here. As a result, the Court need not delve further into the parties' arguments regarding the IXC exception to the reciprocal compensation rules. The Court does note, however, that again many of the arguments made by the parties are more appropriate to the legislative and administrative process than to the judiciary applying the promulgated rules.

### 5. Commingling

INS maintains that, effectively, the IUB "punted" on commingling issues. According to INS, the IUB never resolved the issue of the commingling of traffic in its decisions, and the issue of whether Qwest provided sufficient information to INS to enable it to properly identify and bill the originating wireless carriers continues to be an issue in controversy. INS asserts this is not a threshold legal issue that can be resolved at the present time, but rather a material question of fact to be resolved by the Court after full discovery.

Contrary to INS' view, it seems more accurate to find the IUB did address the commingling issue by allowing that issue to be confronted along with other issues in the negotiation and arbitration process.[61]

---

61. Qwest further contends that during the proceeding before the Board, it vigorously disputed—and refuted—INS' allegations that Qwest's use of the same trunk group to deliver intraMTA traffic and long distance traffic is improper. In particular, Qwest contends the record before the Board shows the following: (1) use of the same trunk group to carry and

Since the Court finds the IUB did not err in either its conclusions that the traffic in this case is "local" and that the reciprocal compensation rules apply, the Court also finds the IUB's determinations with regard to commingling carry the day and need not be analyzed further. In short, the Court acknowledges negotiation as the appropriate route to resolution of the commingling issue and finds the Board's conclusion in that regard does not violate existing federal law.

### 6. Billing Information

Qwest contends the Board's authority to resolve the parties' dispute extends to INS' allegations regarding the sufficiency of the information available to it for purposes of identifying and billing the CMRS providers that originated the calls at issue. After hearing extensive evidence on the issues involved, the Board directed the parties to negotiate a resolution. Qwest contends the Board's resolution is entirely consistent with the 1996 Act's design "to promote negotiated binding agreements." *Iowa Utils. Bd. v. FCC,* 120 F.3d at 801.

INS disagrees, stating it is eminently unfair to allow the relationship between Qwest and INS to continue without requiring Qwest to pass along certain billing information to INS. INS asserts that without that information it is unable to appropriately bill the originating carriers for the

termination of their calls. INS contends that its amended federal tariff accomplishes this result.

On this issue, the Court once again concludes that resort to the negotiation/arbitration process espoused by the IUB is a reasonable manner in which to proceed. Like the commingling issue, the issue of billing information is the exact type of issue best resolved through the negotiation process. While there is appeal to the INS argument that insufficient billing information has been provided by Qwest, nothing in this record suggests the matter would not be resolved through negotiation and, if necessary, arbitration. More important, requiring this process does not violate federal law.

### E. Tariffs

Given the Court's conclusion that the decisions of the Board do not violate federal law, the Court must move to an analysis of the tariff issues at the heart of this lawsuit. INS asserts its tariffs are valid and applicable in spite of the Board's determinations. Thus, according to INS, Qwest must pay INS under the terms of its tariffs. Qwest disagrees, arguing that INS' tariff filing is merely an attempt to bypass the Board's legally valid and enforceable decision.

Qwest essentially argues the FCC lacked jurisdiction to accept a tariff gov-

---

deliver local and long distance traffic, a practice sometimes referred to as "commingling", is very common in the telecommunications industry; (2) many wireline ILECs in Iowa themselves commingle local and long distance traffic; and (3) the purpose of commingling is not to disguise long distance traffic, but to take advantage of efficiencies through use of a single trunk group, particularly when traffic volumes are not sufficient to justify separate trunk groups. Qwest asserts that INS has not demonstrated that the Board's resolution of the trunking issue is arbitrary and capricious, as required to overturn a finding of fact by a state commission.

Given its expertise on telecommunications in Iowa, the Board is obviously in the best position to determine, absent agreement of the parties, the costs and benefits of commingling in Iowa. *See Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.,* 323 F.3d 348, 352 (6th Cir.2003) ("[1996] Act gives state commissions latitude to exercise their expertise in telecommunications and the needs of the local market."). The Board did not prohibit commingling in the proceeding below, though it did reserve the right to revisit the issue upon the request of the parties absent a negotiated agreement. *See IUB Proposed Decision,* at 30.

erning interconnection rates for intrastate wireless traffic. Qwest claims INS is attempting to unilaterally dictate the rates, terms, and conditions for the traffic at issue through filing a tariff, and thereby overriding the applicable FCC and Board determinations. Qwest argues this move should be rejected for numerous reasons.

INS disagrees, arguing the FCC did have jurisdiction, properly accepted its amended federal tariff, and as a result of the filed tariff doctrine and its deemed lawful status, the tariff is valid and enforceable. INS claims this Court may construe the terms of the tariff according to its plain terms without the involvement of administrative agencies because the interpretation of the language in a tariff is a question of law for the judiciary. *Order on Pending Motions,* at 25–26.

### 1. Tariffs in General

█ Tariffs are not mere contracts, but they establish the "law", similar to a regulation or statute. *MCI Telecomms. Corp. v. Garden State Inv. Corp.,* 981 F.2d 385, 387 (8th Cir.1992); *Bryan v. BellSouth Communications, Inc.,* 377 F.3d 424 (4th Cir.2004); *Evanns v. AT&T Corp.,* 229 F.3d 837, 840 (9th Cir.2000); *Fax Telecomms. Inc. v. AT & T,* 138 F.3d 479, 487–88 (2d Cir.1998); *Cahnmann v. Sprint Corp.,* 133 F.3d 484, 488–89 (7th Cir.1998); *MCI Telecomms. Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1096 (3d Cir.1995); *Western Union Int'l, Inc. v. Data Dev., Inc.,* 41 F.3d 1494, 1496 (11th Cir.1995); *MCI Telecomms. Corp. v. Graham,* 7 F.3d 477, 479 (6th Cir.1993). "The terms of a tariff should be given their ordinary meaning, and strained or unnatural constructions are not permitted." *BellSouth Telecomms., Inc. v. Kerrigan,* 55 F.Supp.2d 1314, 1324 (N.D.Fla.1999) (citations omitted).

Here, INS asserts its federal tariff establishes federal law not subject to pre-emption, and that this Court should not second-guess the FCC's decision to accept the tariff. *See Brown v. MCI WorldCom Network Servs., Inc.,* 277 F.3d 1166, 1170 (9th Cir.2002) (finding "no one may bring a judicial challenge to the validity of a filed tariff"). INS urges the Court to construe the tariff as applicable to Qwest and the traffic at issue here.

### 2. Tariffs Involved

█ INS asserts that the INS tariffs on file with the FCC and the IUB establish Qwest is the customer liable for payment of calls carried before November 11, 2000. For calls carried prior to that date, INS asserts the FCC tariff governs interstate traffic and deems the customer the entity submitting an order for service, known as an Access Service Request, and the state tariff governs intrastate traffic and also treats the person submitting the Access Service Request as the customer. Qwest has admitted that it submitted Access Service Requests, and Qwest paid pursuant to the federal and state tariffs for intraMTA wireless-originated calls from the 1980s through April 1999.

INS contends that the Amended FCC Tariff establishes rules more favorable to Qwest for calls carried after November 11, 2000. Under the Amended FCC Tariff, Qwest is treated as the customer liable for charges only if it fails to promptly provide information requested by INS that would facilitate billing the wireless carriers that originate the calls. If Qwest provides the requested information, the wireless carriers are instead treated as the liable customer.

INS claims the amended federal tariff specifically governs intrastate as well as interstate wireless-originated traffic pursuant to the FCC's jurisdiction over intrastate wireless traffic under 47 U.S.C. § 332. INS states the tariff terms clearly

apply to the traffic at issue.[62] INS argues the amended federal tariff supersedes the state tariff for intrastate calls carried after November 11, 2000, with the state tariff providing an alternative ground for recovery in the event Qwest succeeds in its argument that the federal tariff has no application.[63] INS asserts that if Qwest contends it provided the requested information during the relevant times, such competing factual positions can be resolved through discovery.

Qwest, on the other hand, argues INS' position is completely inconsistent with the market-oriented changes to the Communications Act and is foreclosed by FCC and Eighth Circuit precedent. *See Iowa Utils. Bd. v. FCC,* 120 F.3d at 801 (holding the design of the 1996 Act is "to promote negotiated agreements"); *Verizon North, Inc. v. Strand,* 309 F.3d 935, 940 (6th Cir.2002) (*"Verizon North I "*) (recognizing "private negotiations" is "the centerpiece of the Act"); *Pac. Bell v. Pac–West Telecomm., Inc.,* 325 F.3d at 1127 (noting the 1996 Act is intended to "replace the comprehensive state and federal regulatory scheme with a more market driven system that is self-regulated through negotiated interconnection agreements"); *Equal Access NPRM,* at ¶2 (explaining that FCC decision under 47 U.S.C. § 332 are intended "to promote competition by refocusing competitors' efforts away from strategies in the regulatory arena"). Because tariffs are the antithesis of a market driven system, *see In re Policy and Rules Concerning the Interstate, Interexchange Marketplace,* 1996 WL 633345, 11 FCC Rcd. 20730, 20731, 20760, 20762 (1999), *aff'd MCI WorldCom, Inc. v. FCC,* 209 F.3d 760 (D.C.Cir.2000), Qwest urges the Court to find INS cannot override "regulatory barriers—i.e., decisions of the FCC and the Board as to the applicability of access charges, the carrier obligated to pay compensation for transport and termination of intraMTA traffic, and jurisdiction to resolve the foregoing—by the unilateral act of filing a tariff."

Qwest argues INS' position presupposes the unilateral authority of carriers to dictate substantive law, even extending to jurisdiction. In particular, INS claims its Iowa tariff governs compensation for calls at issue through November 11, 2000, and that its amended federal tariff governs calls subsequent to that date.[64] Qwest

---

**62.** The tariff provides:

> When an Intermediary Carrier delivers Transiting Traffic between a CMRS provider and Iowa Network, the Intermediary Carrier shall promptly provide Iowa Network with usage information for that CMRS provider. The usage information shall be in a form acceptable to Iowa Network and, at a minimum, be consistent with MECAB and MECOD guidelines and in EMI format and otherwise sufficient to facilitate the billing of the CMRS provider pursuant to this tariff. If the Intermediary Carrier does not provide the information requested by Iowa Network to accurately bill the CMRS provider, the Intermediary Carrier shall be the customer for purposes of this intrastate and interstate tariff.

**63.** The state tariff does not contain a provision excusing an intermediary carrier like Qwest from liability if it promptly provides information requested by INS to facilitate billing. INS also asserts the amended FCC tariff confirms Qwest's absolute liability for calls carried prior to November 11, 2000, and so is an additional basis for those earlier calls. (Though INS does not explain how the tariff does this).

**64.** Further, Qwest contends INS cannot argue in the alternative that it may declare its federal tariff apply retroactively, i.e., prior to November 11, 2000, through its tariff filing. Retroactive rate changes that are required or even authorized by an agency violate the rule against retroactivity, "a cardinal principal of ratemaking." *City of Piqua v. FERC,* 610 F.2d 950, 955 (D.C.Cir.1979). According to Qwest, if an agency may not authorize retroactive application of rates and terms, neither may a carrier do so unilaterally.

contends that INS cannot shift the authority to determine the lawfulness of its charges or practices for intrastate calls from a state commission to the FCC by filing its amended federal tariff. Qwest argues that no decision or public interest consideration would support such an outcome.

### 3. Tariffs as Appropriate Method to Seek Compensation

INS concedes that a critical component of this case is whether INS can be required to negotiate or arbitrate interconnection agreements with wireless carriers. INS asserts that if the answer is in the negative, then tariffs provide an appropriate alternative to seek compensation for services performed. While this Court has found the IUB direction does not violate federal law, this "critical component" has been resolved adverse to the INS position. However, some additional discussion of the tariff issue is necessary to an understanding of the Court's analysis.

INS asserts the Section 252 interconnection negotiation/arbitration process is available only if the party receiving the interconnection/arbitration request is acting as an ILEC, and only ILECS who are not rural telephone companies are under a duty to negotiate/arbitrate. *See* 47 U.S.C. §§ 251(c)(1), 251(f)(1); 252(a)(1), 252(b)(1). Here, neither INS nor the parties it seeks

to charge are ILECs for purposes of this case. INS is, however, an LEC[65] and a rural telephone company. Qwest is not acting as an ILEC, *INS v. Qwest II*, 363 F.3d at 694 n. 3, and the wireless carriers by statutory definition are not even LECs. *See* 47 U.S.C. § 153(26). Thus, INS asserts the Section 252 interconnection negotiation/arbitration process is unavailable here as the statutory design only applies to ILECs, and none of the parties are classified as such here.

INS further asserts that as a nonincumbent LEC, it is entitled to file a Section 204(a)(3) tariff with the FCC. INS argues that permitting tariffs to be used is consistent with the intent of Congress to promote competition and prohibit activities that prevent such competition. *Michigan Bell Tel Co. v. MCIMetro Access Trans. Servs., Inc.*, 323 F.3d 348, 360–61 (6th Cir. 2003).

It is undisputed that as of the enactment of the 1996 Act, and for three years thereafter, Qwest was paying INS for the traffic at issue pursuant to the INS access tariffs, and that Qwest had been doing so since the 1980s. INS next contends 47 U.S.C. § 251(g) allows for the carry forward of interstate and intrastate access charges until superceded by FCC regulation. 47 U.S.C. § 251(g). This section provided LECs would continue to be subject to the

---

**65.** INS asserts that it, rather than Qwest, is providing the LEC portion of the call routing. INS explains,

In the switching hierarchy, a local exchange carrier operates the end office that does the final switching of the call for delivery of the call to the called party. The same or (as in this case) a different LEC will own the tandem switch (next highest level in the hierarchy) that switches the call to the end office switch. Above that level, the transmission between tandem switches is an IXC rather than a LEC function. INS provides the tandem switching to the rural ILEC end offices, and so functions as an

LEC. 47 C.F.R. § 69.111(a)(2). Moreover, the centralized equal access services provided by INS are specifically mentioned in Part 69 of the FCC's rules (regulations governing access charges), *see* 47 C.F.R. § 69.112(i), demonstrating that INS's services are governed by the access charge regime ... By contrast, Qwest provides a tandem-to-tandem transiting service, consistent with the IXC function. This distinguishes Qwest's function here from the case in which a large ILEC provides the tandem switch that directs the call to the end office switch owned by the rural LEC seeking access charges.

same "equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation)" to which they had previously been subject. *Id.* INS argues the carry forward provision of Section 251(g) clearly contemplates the access charge regime established by INS' tariffs be continued until interrupted by FCC action.

INS further argues that Qwest improperly relies on the "local" terminology to support its argument that intermediary carriers are barred from collecting access charges for transiting intraMTA traffic. INS contends the FCC has abandoned the "local" terminology, and asserts the important issue is whether or not the charges are governed by the reciprocal compensation rules of the 1996 Act. *See ISP Remand Order,* at *15, 16 FCC Rcd. at ¶ 45 (reasoning that eliminating the category of "local" traffic better reflects the role of section 251(g) in distinguishing between charges that are governed by reciprocal compensation rules and charges that are governed by the access rules).

Regardless of the terminology used, INS argues that the FCC's separate decision not to regulate the charges of intermediary carriers leaves those carriers free to impose "transiting charges" equal to their former "access charges". *See Verizon Virginia Order,* at *35, 17 FCC Rcd. at ¶¶ 115–117 (rejecting attempt to limit Verizon's transit charges to the forward-looking cost standard governing ILEC reciprocal compensation charges, thereby allowing Verizon to charge higher rates set by Verizon). Thus, according to INS, any objection to charging "access charges" is at most a matter of semantics, and to avoid a semantical debate, INS' amended federal tariff describes the traffic at issue as "transiting" traffic and imposes a charge for carrying it.

Finally, INS asserts that the determination of who it decides to charge for its services as a transiting carriers is its own. In other words, INS argues it is not limited to the decision of Qwest to bill the originating carriers nor Qwest's contractual agreement with those carriers that Qwest is not liable for transiting charges on INS' system. INS reiterates that the FCC has refrained from adopting specific rules governing transiting carrier charges, *see id.,* and that INS' decision to charge the originating carrier, unless a previous transiting carrier fails to pass on information requested by INS to facilitate billing the originating carrier, is eminently reasonable and fair.[66]

Qwest argues that Congress did not in the 1996 Act provide for the "continuation of all pre-existing charging systems" as INS contends. Rather, Congress provided only that LECs would continue to be subject to the same "equal access and nondiscriminatory interconnection restrictions and obligations" to which they had previously been subject, until the FCC determined otherwise. *See* 47 U.S.C. § 251(g). Thus, according to Qwest, Section 251(g) was never intended to confer *benefits* on LECs as INS implies.

Further, because the FCC had required prior to the 1996 Act that the rates and terms applicable to LEC–CMRS interconnection for traffic classified as "local" be established through interconnection agreements, not tariffs, INS' use of tariffs for the traffic at issue here could not, by definition, be a practice that is "carried forward" under the Act. Finally, Section 251(g) expressly authorizes changes by the FCC to the intercarrier compensation regime, which includes changes in the criteria used to determined whether wireless traffic is classified as "local" or "long distance" for the purpose of determining the

---

**66.** INS argues the FCC acceptance of its tariff demonstrates the FCC finding that such tariff

changes were reasonable. This will be discussed *infra,* at sections E.4 and E.10.

applicability of access charges. Qwest contends the FCC made such a change in its *Local Competition Order* when it determined that calls that are placed and received in the same MTA would be classified as local.

The Court has already determined the Board did not err when it defined the traffic at issue as "local" traffic not subject to access charges, nor did the Board err in holding the appropriate manner of compensation was through reciprocal compensation arrangements arrived at by negotiation/arbitration. The Court finds, and INS seems to recognize in its arguments, that the tariffs become important only if INS cannot be required by the IUB to enter the negotiation/arbitration process. This is, however, within the power of the IUB as outlined above and is consistent with the thrust of the 1996 Act. The Court further agrees with the Board that this situation, under the essentially changed ground rules of the 1996 Act, presents a situation clearly appropriate for negotiation/arbitration, which addresses all of the complicating factors such as the role of the wireless carriers, the commingling of calls, and the proper level of compensation for all parties.

Pursuant to these determinations, and their interpretation of the 1996 and FCC implementing decisions, the Court finds the original federal tariff and the state tariff inapplicable to the traffic at issue. These tariffs purport to charge access charges, thinly veiled as transit charges, which are unavailable for this type of traffic following passage of the 1996 Act. Moreover, the Court finds the amended federal tariff is an attempt by INS to sidestep the decision of the Board, and therefore contradicts the legal framework for "local" traffic as provided in the 1996 and the FCC's subsequent decisions. The Court does not allow a tariff pursued as a device to defeat the ongoing regulatory process to thwart the authority of the IUB. The Court discerns no applicable legal precedent and no policy basis that would allow the amended federal tariff to override the thrust of the 1996 Act and the properly exercised authority of the IUB.

Accordingly, the Court finds the tariffs asserted by INS are not the controlling method of compensation for the transport of the traffic at issue. The appropriate avenue is through negotiation/arbitration to reach reciprocal compensation agreements. In making this determination, the Court is not examining the terms and provisions of the tariff, the procedure by which it was obtained, or otherwise intending to invade the jurisdiction of the FCC. Instead, the Court is finding the tariffs do not effectively displace the 1996 Act and the valid IUB decision. INS' filing of the amended federal tariff was a strategic attempt to thwart the impact of the 1996 Act, to seek some certainty in a field plagued by uncertainty, and to create an alternative to any adverse determinations of the IUB. Accordingly, the Court finds the tariffs at issue do not apply to the traffic at issue, and Qwest cannot be held liable under their terms. Under the current state of the law, compelling arguments may be made on both sides of this issue; and this collision of concepts may demand further attention by the Congress and the FCC. However, this Court must make a determination between these fundamentally competing concepts, and does so on the basis of current law.

The Court further finds it need not extensively analyze the parties' additional arguments concerning tariffs in light of the Court's underlying determination that the tariff is not applicable to the traffic at issue. These arguments include FCC jurisdiction and regulation versus state commission jurisdiction, conflict preemption, the "filed tariff" doctrine, "deemed lawful" status, and the validity and enforceability

900

of the tariff language. Simply put, the Court has not engaged in any analysis of the terms of the tariff and none of these issues upsets the Court's determination regarding the applicability of the tariffs to the traffic at issue.

### 4. The FCC's Recent *T–Mobile Wireless Termination Order*

During the pendency of the present motions, the FCC released its *T–Mobile Wireless Termination Order.* The T–Mobile petitioners had sought a declaratory ruling that "wireless termination tariffs are not a proper mechanism for establishing reciprocal compensation arrangements for the transport and termination of traffic." *T–Mobile Wireless Termination Order,* at *1, 20 FCC Rcd. at ¶ 1.[67]

INS asserts this order supports its position with regard to the propriety and applicability of its filed tariffs. In the *T–Mobile Wireless Termination Order,* the FCC ruled that under existing FCC rules it was not unlawful "per se" for LECs terminating wireless-originated calls to collect charges from wireless carriers through the use of termination tariffs. *T–Mobile Wireless Termination Order,* at *3, 20 FCC Rcd. at ¶ 9. The FCC found that nothing in its rules prevented the use of tariffs in a manner that did not conflict with an agreement negotiated or arbitrated pursuant to Section 252 of the Commu-

nications Act. *Id.* at *4, 20 FCC Rcd. at ¶ 13. According to INS, this confirms Qwest was wrong in arguing tariffs are an unlawful means for charging for wireless-originated traffic and that section 252 is the exclusive means for establishing interconnection compensation arrangements.

INS asserts that Qwest and INS do not have a negotiated or arbitrated Section 252 agreement with which its federal tariff could conflict.[68] INS argues that as a result, the *T–Mobile Wireless Termination Order* indicates there is nothing to prevent INS from enforcing the tariff in this case.

The FCC went on to prospectively amend [69] Rule 20.11 to provide that "[l]ocal exchange carriers may not impose compensation obligations for traffic not subject to access charges upon commercial mobile radio service providers pursuant to tariffs." New 47 C.F.R. § 20.11(e) (taking effect 30 days after publication in the Federal Register). INS asserts that to the extent any commingled calls that Qwest delivers to INS after the effective date of the new rules are intraMTA wireless-originated calls, new rule 20.11(e) will need to be considered but will not impact this case. First, INS' tariff seeks to impose charges on a *landline* carrier that commingles calls whereas the new rule, by its language, governs only the imposition of charges on *wireless* carriers.[70] Second, INS points

---

67. The T–Mobile petitioners asserted that "such tariffs are unlawful because they (1) bypass negotiation and arbitration procedures in sections 251 and 252 of the Act; (2) do not provide for reciprocal compensation to commercial mobile radio (CMRS) providers; and (3) contain rates that do not comport with the Total Element Long–Run Incremental Cost (TELRIC) pricing methodology as required by the Commission's rules." *T–Mobile Wireless Termination Order,* at *1, 20 FCC Rcd. at ¶ 1.

68. INS also reiterates that as a *federal* tariff reviewed by the FCC before going into effect, the amended federal tariff is not even subject

to the kind of post-effective date preemption attacks mounted unsuccessfully by the petitioners in the *T–Mobile Wireless Termination Order. See* discussion *infra,* at section E.10.

69. As a new administrative rule, Rule 20.11(e) has no retrospective effect. *T–Mobile Wireless Termination Order,* at *1, 20 FCC Rcd. at ¶ 1.

70. INS notes that the FCC in the *T–Mobile Wireless Termination Order* recognized the existence of disputes regarding whether a terminating LEC may charge an intermediary landline carrier for wireless-originated calls, but

out the new rule applies to traffic "not subject to access charge," [71] but contends the wireless-originated portion of the commingled traffic delivered by Qwest is in fact subject to access charges due to Qwest's actions in delivering such traffic over interexchange trunks as interexchange traffic.[72] Finally, the new rule governs payment of reasonable compensation to the terminating carrier, *id.* at \*1, 20 FCC Rcd. at ¶ 2, and thus, like the parallel reciprocal compensation rules, Rule 20.11 only governs the charges of terminating carriers and not intermediary carriers such as INS.[73]

Qwest disputes INS' reading of the impact of the *T–Mobile Wireless Termination Order* and contends that it provides no basis for denying Qwest's motion for summary judgment. Qwest maintains the FCC merely held that prior to the effective date of the *Order,* *state* tariffs accepted by a state commission establishing the rates and other terms for transport and termination of intraMTA calls were not *"per se"* invalid under federal law. *Id.* at \*4 n. 40, 20 FCC Rcd. at ¶ 10 n. 40.

Qwest finds it important that the FCC did not hold *federal* tariffs lawful, but instead deliberately limited its holding to *state* tariffs. *See id.* at \*3, 4, 20 FCC Rcd. at ¶¶ 7, 9, 10. Specifically, the FCC observed that its pre-Act decisions had "acknowledged that the intrastate portions of interconnection arrangements are sometimes filed in state tariffs," but had "specifically declined to preempt state regula-

tion of LEC intrastate interconnection rates applicable to CMRS providers." *Id.* at \*4, 20 FCC Rcd. at ¶ 10. Based on this, Qwest contends the *T–Mobile Wireless Termination Order* confirms the jurisdiction of state commissions over intrastate interconnection rates, and that allowing a carrier to preempt this jurisdiction by filing a federal tariff contravenes the *Order* and the pre-Act decisions relied upon by the FCC.

Contrary to INS' assertion, Qwest argues the *T–Mobile Wireless Termination Order* confirms that the FCC's pre-Act decisions intended that CMRS interconnection issues would be resolved in "negotiated agreements between the parties," and further "express[ed] an expectation that tariffs would be filed only after carriers have negotiated agreements." *Id.* at \*4, 20 FCC Rcd. at ¶ 11. Indeed, the *Order* reaffirms and states clearly the FCC's "clear preference for contractual arrangements for non-access" traffic. *Id.* at \*5, 20 FCC Rcd. at ¶ 14.

In any event, Qwest points out that the *T–Mobile Wireless Termination Order* is clearly limited to tariffs that "apply only in the absence of an agreement," *id.* at \*4, 20 FCC Rcd. at ¶ 13, and does not apply to tariffs that "purported to apply even when a valid interconnection agreement could be in place." *Id.* at \*4 n. 53, 20 FCC Rcd. at ¶ 13 n. 53 (approving prior use of tariff that was "expressly subordinate" to approved agreements). Qwest argues that INS' tariff purports to establish the terms

---

did not resolve those disputes. *T–Mobile Wireless Termination Order,* at \*2, 20 FCC Rcd. at ¶ 6; new rule 20.11(f). Thus, INS argues the resolution of this issue in the present case is governed by INS' "deemed lawful" tariff.

**71.** INS notes that the FCC in the *T–Mobile Wireless Termination Order* again recognized but did not resolve the dispute regarding whether intraMTA wireless-originated traffic delivered through a landline intermediary

carrier constitutes access traffic. *T–Mobile Wireless Termination Order,* at \*2, 20 FCC Rcd. at ¶ 6. INS asserts that its amended federal tariff uses generic language so that the right to charge does not depend on how the traffic is classified or labeled.

**72.** *See* discussion *supra,* at sections C.2.b and D.4.

**73.** *See* discussion *supra,* at section D.2.a.

and conditions governing INS' transport of calls from a subscriber of a CMRS provider and makes no exception for calls that are subject to an existing interconnection agreement. *See* INS FCC Tariff No. 1, section 16.1, orig. pg. 186, issued October 27, 2000.

Finally, Qwest argues that nothing in the *Order* authorizes a carrier to unilaterally impose the compensation obligation on the transit carrier, as this would be a violation of the FCC's "calling party's network pays" principle.[74] Qwest asserts the *T–Mobile Wireless Termination Order* thus confirms the originating CMRS providers must compensate other carriers providing transport and/or termination even where there is an indirect interconnection and the transiting carrier commingles the calls.

The Court first finds the FCC's discussion in the *T–Mobile Wireless Termination Order* was merely a clarification of existing standards, and not a change in the law. As a result, the IUB's subsequent determinations related to reciprocal compensation and the obligations of the parties was also in accordance with federal law. While several of these issues have not been expressly determined by the FCC, such determinations by the state commission are entirely appropriate in the absence of such express conclusions. Thus, the IUB was within its authority to find Qwest was not acting was not obligated to pay access charges and that the terminating LECs needed to seek compensation from the originating carriers under a reciprocal compensation arrangement.

The Court further repeats that the IUB also did not offend federal law in strongly suggesting the parties (including the transiting carriers) negotiate reciprocal compensation arrangements, and if those negotiations failed, to seek arbitration before the Board. As noted in the *T–Mobile Wireless Termination Order*, the FCC strongly encourages negotiation/arbitrations in accordance with its "strong preference for contractual arrangements." *T–Mobile Wireless Termination Order*, at *3, 20 FCC Rcd. at ¶ 9. Accordingly, the Court finds the actions undertaken by the Board and this Court's determination that INS' amended tariff is not applicable to the traffic at issue here in light of the IUB's decisions are entirely appropriate and consistent with the aims of the 1996 Act, the FCC's implementing decisions, and the *T–Mobile Wireless Termination Order*.

## F. The Self-help Claim

INS' Amended Complaint alleges that Qwest's refusal to pay in accordance with the terms of INS' FCC Tariff and Amended FCC Tariff constitutes unjust, unreasonable, and unlawful self-help in violation of 47 U.S.C. § 201(b).[75] As a result, INS maintains that it is entitled to monetary damages and attorneys' fees pursuant to 47 U.S.C. § 206.

Section 201 provides, in relevant part, that "[a]ll ... practices ... for and in connection with such communications service, shall be just and reasonable, and any such ... practice ... that is unjust or unreasonable is hereby declared to be un-

---

**74.** The "calling party's network pays" principle, or CPNP, has been explained by the FCC as its "existing access charge rules, and the majority of reciprocal compensation agreements, require the calling party's carrier, whether LEC, IXC, or CMRS, to compensate the called party's carrier for terminating the call." *Intercarrier Compensation NPRM,* 1996 WL 452885, 11 FCC Rcd. at ¶ 6.

**75.** The self-help count was one of two claims added in Plaintiff's Amended Complaint, which was the subject of this Court's December 2, 2004, Order. In that order, the Court granted Plaintiff leave to amend, holding Plaintiff did not unduly delay in seeking to amend its Complaint and that the self-help claim was not futile.

lawful." 47 U.S.C. § 201(b). INS argues the FCC has found the refusal of a carrier to pay for services ordered and received amounts to impermissible self-help and a violation of section 201(b). *See MGC Communications, Inc. v. AT&T Corp.*, 1999 WL 503598, 14 FCC Rcd 11647, at ¶ 27 (1999).

Indeed, "the law is clear on the right of a carrier to collect its tariffed charges, even when those charges may be in dispute between the parties." *Communique Telecomms., Inc.*, Declaratory Ruling and Order, 1995 WL 318842, *9, 10 FCC Rcd 10399, 10405 (1995) (citing *Tel–Central of Jefferson City Missouri, Inc.* Memorandum Opinion and Order, 1989 WL 511967, *2, 4 FCC Rcd. 8338, 8339 (1989), *City of Girard v. FERC*, 790 F.2d 919, 922–23 (D.C.Cir.1986), *AT & T Co. v. Florida–Texas Freight, Inc.*, 357 F.Supp. 977, 979 (S.D.Fla.1973), *aff'd per curiam*, 485 F.2d 1390 (5th Cir.1973), and *Mocatta Metals Corp. v. ITT World Communications, Inc.*, 1975 WL 30519, *2, 54 FCC2d 104, 105 (1975)). INS asserts that carriers that claim tariff rates are unreasonable "may file complaints with the Commission under [47 U.S.C. § 208], but may not automati-cally withhold payments of legally tariffed charges merely by asserting that the rates are unreasonable." *Id.* (citing *Business WATS, Inc. v. AT & T Co.*, 1992 WL 690972, 7 FCC Rcd 7942 (1992) (finding a customer is not entitled to the self-help measure of withholding payment for tariffed services duly performed, but should first pay, under protest, the amount allegedly due and then seek redress if such amount was not proper), and *MCI Telecomms. Corp.*, 1976 WL 31327, 62 FCC2d 703, 706–07 (1976) (finding customers may not withhold payment of properly billed tariffed charges for voluntarily ordered services)).[76]

To prevail on its self-claim, INS must prove Qwest unlawfully withheld payment due under the terms of valid and applicable tariff. The Court discussed these issues above and will not repeat them here.[77]

█ Qwest argues that its nonpayment of amounts invoiced to it for transit traffic does not give rise to a cause of action for "self-help". First, Qwest maintains INS' self-help claim depends on a finding, foreclosed by law,[78] that Qwest is liable to INS under INS' federal tariff.[79] Qwest argues that there can be no violation of section

---

**76.** While INS is proceeding under federal law, Iowa law also appears to recognize the prohibition against self-help. *See AT & T Communications of the Midwest v. Iowa Utils. Bd.*, 687 N.W.2d 554, 562 (Iowa 2004) ("AT & T cannot institute a challenge to the [tariffed] rate merely by not paying the bill.").

**77.** The Court's Order on Pending Motions admonished the parties that their supplemental briefs were to be "limited to the new issues raised in the Amended Complaint, i.e., the self-help and quantum meruit counts." Qwest contends INS' supplement in opposition of summary judgment violated this order by repeating arguments to support its tariff claims and adding extensive new arguments that its tariffs should be construed to impose liability on Qwest. Qwest contends INS should have incorporated by reference any arguments related to the tariff claims applica-ble also to the self-help claim. Qwest further contends INS' violation is prejudicial to Qwest.

The Court finds, however, that any improper arguments made by INS are not prejudicial to Qwest. The repeated arguments are mere surplusage, and the allegedly new arguments are similar enough to previously filed arguments to not be considered novel or surprising. In any event, Qwest has had opportunity to respond to all of the arguments made by INS and has not been prejudiced by their inclusion in this Court's analysis.

**78.** *See* discussion *supra*, at section E.

**79.** INS itself conceded that this count does not state additional grounds for liability but was asserted for the purpose of seeking attorneys' fees. *Order on Pending Motions*, at 12 (noting INS' assertion that the self-help claim

201 based on nonpayment of amounts not actually owed. In that vein, Qwest argues its conduct is materially distinguishable from the sole case cited by INS in support of its self-help claim in that the defendant in that case withheld payment for charges for which it was ultimately found liable. *See MGC Communications, Inc. v. AT&T Corp.*, 1999 WL 503598, 14 FCC Rcd. 11647 (FCC 1999) (finding that plaintiff's tariff lawfully imposed liability on the defendant for the amounts the defendant had withheld). In addition, unlike the defendant in the case cited by INS, Qwest filed with the IUB—the agency that regulates and supervises intrastate transport of telephone calls within the State of Iowa—its petition for declaratory ruling, and the Board held Qwest was not liable to INS for access charges, leaving to future negotiation the determination of any applicable compensation, thereby confirming the reasonableness of Qwest's actions.[80]

In finding Qwest is not liable to INS under the Amended FCC Tariff, and that the original federal tariff is no longer applicable, it follows INS' self-help claim is likewise not applicable. Accordingly, the Court must grant Qwest's motion for summary judgment on this claim.

## G. Unjust Enrichment

In a prior ruling, this Court found that Qwest received no benefit from INS' service, and therefore INS' unjust enrichment claim failed as a matter of law. In reaching that ruling, the Court relied on the finding that Qwest was an "involuntary intermediary" compelled by the Communications Act to continue delivering wireless calls to INS. *INS v. Qwest I*, 2002 WL

31296324, at \*32, 35. On appeal, the Eighth Circuit disagreed that Qwest was acting involuntarily as it was not functioning as an ILEC or LEC "with respect to the traffic here at issue." *INS v. Qwest II*, 363 F.3d at 694 n. 3. The Eight Circuit also found this Court improperly relied on the IUB's determination in finding Qwest was not a beneficiary of INS' services. *Id.* at 694. The appellate court then reinstated the unjust enrichment count and left the issue open, "as the proper treatment of the claim depends on the disposition of INS's other claims." *Id.* at 695.

 To support an unjust enrichment claim, "it is essential merely to prove that a defendant has received money which in equity and good conscience belongs to the plaintiff." *In Re Estate of Stratman*, 231 Iowa 480, 1 N.W.2d 636, 642 (Iowa 1942). Because "unjust enrichment does not occur in the abstract," the Court will look to "federal statute[s] for guidance in determining whether one has … been unjustly enriched," *see Iconco v. Jensen Constr., Co.*, 622 F.2d 1291, 1296, 1299 (8th Cir. 1980), with said statutes being the provisions of the Communications Act in present action. *INS v. Qwest I*, 2002 WL 31296324, at \*31.

INS asserts that there remain genuine issues of material fact on its unjust enrichment claim. According to INS, all Qwest had to do to end liability to INS for wireless-originated calls was to stop forwarding those calls to INS or, for calls carried after the effective date of the Amended Federal Tariff, provide INS with the requested information to allow INS to directly bill the wireless carriers.[81] Instead,

---

was advanced to make additional remedies, specifically recovery of attorneys' fees, available and not as an additional ground for liability).

**80.** Qwest also asserts that if any party to this litigation engaged in self-help it was INS

through its unilateral filing of its Amended Federal Tariff in an attempt to circumvent the jurisdiction and decision of the IUB.

**81.** Another alternative discussed by the parties was for Qwest to deliver calls originated by third-party wireless carriers on a separate

Qwest continued to deliver those calls. INS asserts that Qwest did this knowing that INS expected payment from Qwest.

INS further asserts that a reasonable trier of fact could find that Qwest received a benefit from INS' service. By delivering the calls to INS for eventual delivery to the independent LEC's and their customers, Qwest effectively extended *de facto* the value and reach of its network, thereby allowing Qwest to sell the wireless carriers access not only to Qwest's network but also to INS' network which reaches nearly every rural ILEC in Iowa. Qwest could have protected itself by insisting on and negotiating the pass-through of INS' charges. *See INS v. Qwest I*, 2002 WL 31296324, at * 33. As INS argues, "proving unjust enrichment does not require complicated technical or legal arguments," *id.*, at *31, and INS maintains it has provided sufficient evidence to avoid summary judgment on this issue.

Qwest, on the other hand, argues that INS' claim for unjust enrichment should be dismissed as a matter of federal and state law for two reasons: (1) federal and Iowa law prohibit equitable or other remedies that would have the effect of bypassing applicable regulation; and (2) the record before the Board establishes that Qwest has received no money that belongs to INS.

■ It is well-settled that a claim for unjust enrichment must be dismissed if applicable federal or state regulation pro-

vides a compensation mechanism to the plaintiff. *See, e.g., Iconco*, 622 F.2d at 1296; *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 986 (7th Cir.2000); *Equal Access Corp. v. Utils. Bd.*, 510 N.W.2d 147, 150 (Iowa 1993). According to Qwest, the FCC and the Iowa Legislature "clearly intended intercarrier compensation to be determined by the Board based on regulatory laws and principles, not by the courts based on general principles of 'equity.'"

■ In the present case, the Board determined INS should seek compensation from the originating third-party wireless carriers through a negotiated (or Board arbitrated) interconnection agreement, and that any such agreement would apply retroactively.[82] Qwest argues this is consistent with federal and state law,[83] and therefore the equitable remedy of an unjust enrichment claim may not be invoked to bypass this regulatory remedy. *See Union Tel. v. Qwest*, slip op. at 34 ("Equitable doctrines cannot apply to relieve [plaintiff] of its obligation to comply with state and federal regulatory requirements. Positing arguments that compensation may be appropriate in the face of such overwhelming failure to comply with the applicable requirements is unavailing.").[84]

Qwest next contends INS' unjust enrichment claim fails because it cannot show Qwest received "'money which in good conscience belongs to [INS],'" *INS v. Qwest I*, 2002 WL 31296324, at *14 (quot-

---

trunk (i.e., not commingled), which would have allowed INS to isolate and block non-paying traffic. INS asserts that it was unable to identify and block in real time calls because Qwest commingled calls and delivered all of them to INS on the same trunks.

**82.** No CMRS provider has objected to the Board's ruling. INS does, however, renew its arguments that the remedy suggested by the IUB, i.e., negotiation of interconnection agreements, is not available to INS, and the

IUB cannot require INS to negotiate an interconnection agreement. *See* discussion *supra*, at section D.2.

**83.** *See* discussion *supra*, at sections D.2 and D.3.

**84.** In *Union Tel. v. Qwest*, the court found applicable the regulatory scheme delineated in section 252 of the Communications Act. As discussed above, INS urges the Court to find the scheme inapplicable.

ing *In re Estate of Stratman*, 1 N.W.2d at 642), as Qwest received no money for the transport by INS of the traffic at issue. Qwest urges this Court to again find no benefit accrued to Qwest. *See INS v. Qwest I*, 2002 WL 31296324, at *15 (citing *3 Rivers Tel. Coop. v. U.S. West*, 125 F.Supp.2d 417 (D.Mont.2000) ("Plaintiff ... argue that ... U.S. West is liable for the terminating access charges having received the benefit of those transactions. But where is the benefit? If U.S. West is not the end user's long distance carrier, and therefore lacks the ability to receive any compensation through billing for that call, no benefit accrues to U.S. West for which it should be asked to pay charges to an independent [LEC]."), *rev'd and remanded on other grounds*, 45 Fed.Appx. 698 (9th Cir.2002)).

Qwest further contends the compensation it receives from the CMRS providers is for the use of *Qwest's* network, and not for the use of *INS'* network. In addition, Qwest's agreements with the originating CMRS providers make clear that compensation owed to INS and its ILEC owners for their transport and termination of the traffic at issue is a matter separate from compensation for the use of Qwest's facilities.

Finally, Qwest contends that INS' factual allegations are insufficient to support a claim for unjust enrichment. As to the "value and reach" benefit argument advanced by INS, Qwest argues such a theo-

ry is overbroad in addition to not meeting the requirement that INS show Qwest received money belonging to INS. Indeed, INS can provide no evidence to support a finding that some of the compensation received by Qwest was for the use of INS' network.[85] Qwest also contends that INS identifies no law requiring Qwest to cease providing transiting service to the CMRS providers[86] or requiring Qwest to serve as INS' billing agent by collecting and remitting to INS its charges. Finally, Qwest argues that INS' assertion that its unjust enrichment claim will "motivate" Qwest to become INS' billing and collection agent is unsupported by state or federal law.

INS disputes Qwest's assertions, contending first that Qwest conveniently forgets the equitable remedy suggested by the IUB, i.e., negotiation of interconnection agreements, is not available to INS. Therefore, INS has sought compensation through its filed tariffs. If the Court determines the tariffs do not apply for some reason, INS seeks compensation through its unjust enrichment claim stating, "[i]t is not equitable for INS to provide a valuable service to Qwest, but not have the ability to be paid for that service."

INS continues and contends that the *Iconco* case actually supports INS' position in that the court allowed the losing contestant for a government contract to sue the winning contestant for unjust enrichment rather than pursuing the available regulatory remedy of protesting the contract

---

**85.** Qwest contends that any such evidence, though none was even alleged by INS, would be mere conjecture and speculation. *See Wilson v. IBM Corp.*, 62 F.3d 237, 241 (8th Cir. 1995) (finding that "to withstand motion for summary judgment, the non-moving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture or fantasy") (quotations and citations omitted); *Nagle v. Merrill Lynch, Pierce, Fenner & Smith*, 790 F.Supp.

203, 205 (S.D.Iowa 1992) (finding summary judgment "opponent must do more than simply show there is some metaphysical doubt as to the material facts").

**86.** Qwest further asserts its offer to provide transiting service, if not required to do so, "was manifestly pro-competitive and pro-consumer, because it enabled the CMRS providers (and their customers) to avoid the costs they would have incurred to connect directly with INS." *See IUB Proposed Decision*, at 30.

award. *Iconco,* 622 F.2d at 1296. The court reasoned that the existence of a federal remedy should not preempt unjust enrichment "unless that was the clear and manifest purpose of Congress." *Id.* ("[W]e should not find that Congress intended to deny Iowa the right to vindicate in its chosen manner its over-riding state interest in redressing unjust enrichment and fraud, an interest historically and deeply rooted in its common-law tradition, unless that was the clear and manifest purpose of Congress.").

INS asserts there is nothing in the Communications Act requiring INS negotiate an interconnection agreement or forfeit the right to all payment. INS asserts that because the FCC created the reciprocal compensation remedy to benefit terminating carriers, it is highly doubtful that INS as an intermediary carrier has such a remedy against the wireless carriers. *See Texcom Reconsideration Order,* 2002 WL 459938, at *2, 17 FCC Rcd. at ¶ 4; *Mountain Communications,* at * 1, 17 FCC Rcd. at ¶ 3. INS asserts further that even if such a remedy exists, INS may still pursue an unjust enrichment claim. *See Worldcom. Inc. v. Graphnet, Inc.,* 343 F.3d 651, 657 (3d Cir.2003) (finding that failure to comply with a Communications Act requirement involving procedures for estab-

lishing a contract or tariff would not bar an unjust enrichment claim); [87] *see also State ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 155 (Iowa 2001) ("The adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity but no independent principle exists that restricts restitution to cases where alternative remedies are inadequate"). Moreover, INS asserts the statutory presumption noted in *Bastien v. AT&T Wireless Services, Inc.* is not implicated in this case as the present action does not concern rates charged by wireless carriers. *Bastien,* 205 F.3d at 986–87; 47 U.S.C. § 332(c)(3) (providing that states may not set rates charged by wireless carriers); *see also Phillips v. AT & T Wireless,* 2004 WL 1737385 (S.D.Iowa Jul. 29, 2004) (finding complete preemption for actions concerning market entry or rates and remanding the matter because it did not concern rates). Additionally, INS maintains that the fact that the alleged remedy is against third parties rather than Qwest undermines Qwest's argument.

 The FCC has acknowledged the potential availability under state law of unjust enrichment and quantum meruit in the absence of an applicable tariff. *See In the Matter of Petitions of Sprint PCS and*

**87.** INS asserts this case is better reasoned than the unpublished Wyoming District Court opinion relied upon by Qwest. *Cf. Union Tel. v. Qwest,* slip op., No. 02–CV–204–D (D.Wy. May 11, 2004). INS notes that the court in *Union* relied on this Court's 2002 *Ruling on Motion to Dismiss,* which was subsequently reversed by the Eighth Circuit. Consequently, there is currently pending in *Union* a motion to amend the judgment. In addition, INS draws attention to the fact that the plaintiff in that case is an ILEC under the 1996 Act, a status not shared by INS in the present action.

Qwest counters that this case is easily distinguished from the present action as there was no remedy available in *Worldcom, Inc. v.*

*Graphnet, Inc.* Qwest contends that Congress in no way intended to grant the option to bypass remedies provided by state agencies which were charged with administration of the 1996 Act, and the FCC in fact questioned the availability of an unjust enrichment claim under the rule previously discussed. *See Petition for Declaratory Ruling Regarding CMRS Access Charges,* 17 FCC Rcd. 13192, at ¶ 13 n. 40 (2002) (citing *Bastien,* 205 F.3d at 986). Qwest further asserts the Board's decision forecloses any doubt that INS has a remedy against the wireless carriers as the IUB expressly provided a remedy that remains available to INS, i.e., retroactive application of the results of the negotiation/arbitration process.

*AT & T Corp., for Declaratory Ruling Regarding CMRS Access Charges, Declaratory Ruling,* 2002 WL 1438578, at *4, 17 FCC Rcd. 13192, at ¶ 12 (2002). Iowa law also permits parties with a contract to recover for unjust enrichment on a point not covered by the contract, *see Sulzberger Excavating, Inc. v. Glass,* 351 N.W.2d 188, 194 (Iowa App.1984) ("An implied contract on a point not covered by an express contract is not superseded by the express contract."), and the Eighth Circuit similarly reasoned in this case that an unjust enrichment claim may exist if this Court determines the federal tariffs inapplicable. *INS v. Qwest II,* 363 F.3d at 694–95.

INS also argues that allowing its unjust enrichment claim furthers Congress' intent in passing the 1996 Act and the FCC's implementing policies. INS essentially contends that holding Qwest liable to INS will motivate Qwest to pass along those costs to the originating carriers, the same parties Qwest agrees should be responsible for compensation. In this manner, both Qwest and INS will be compensated for use of their networks. INS argues charging Qwest is equitable given Qwest's resistance to providing INS with requested information to facilitate billing and because Qwest voluntarily sent commingled calls knowing INS expected payment.

Finally, INS maintains the benefit element is satisfied in the present case. INS asserts that a benefit may be "any form of advantage", *Okoboji Camp Owners Coop. v. Carlson,* 578 N.W.2d 652, 654 (Iowa 1998), and need not come directly from the plaintiff.[88] *Iconco,* 622 F.2d at 1302 ("[W]e find no requirement in the cases that the plaintiff itself must have conferred the benefit sought to be recovered from the defendant."); *Helm Fin. Corp. v. Iowa Northern Ry.,* 214 F.Supp.2d 934, 988 ("[I]t is not essential that the party seeking restitution paid money directly to the recipient."); *see also Credit Bureau Enters., Inc. v. Pelo,* 608 N.W.2d 20, 27 (Iowa 2000). INS reasserts its "value and reach" benefit theory that Qwest was paid by the wireless carriers for a service that was worthless without INS' assistance and that this service extended the reach of Qwest's network to include the entire INS network (against INS' wishes) through commingling calls.

Whether there exists a viable common law unjust enrichment claim sufficient to survive summary judgement may be negated if there exists an express contract. In discussing INS' unjust enrichment claim, the Eight Circuit provided the following guidance:

> Unjust enrichment is an equitable doctrine of restitution, wherein a plaintiff 'must prove the defendant received a benefit that in equity belongs to the plaintiff.' *Slade v. M.L.E. Inv. Co.,* 566 N.W.2d 503, 506 (Iowa 1997). The doctrine is based on the concept of an implied contract. However, '[a]n express contract and an implied contract cannot coexist with respect to the same subject matter,' and Iowa courts refuse to imply a contract where an express contract exists. *Chariton Feed & Grain, Inc. v. Harder,* 369 N.W.2d 777, 791 (Iowa 1985) (rejecting claim for unjust enrichment where the controversy was covered by an express contract). *Thus, to the extent that the basis for INS's claim*

---

88. Qwest contends that this argument misses the point, which is that Qwest received no benefit from any party "which in equity or good conscious belongs to" INS. *Iconco,* 622 F.2d at 1295 (quoting *In re Estate of Stratman,* 1 N.W.2d at 642). Qwest asserts that the minuscule charges (i.e., 1/4 cent per minute) received by Qwest from the CMRS providers was solely to compensate Qwest for the use of its network and did not cover the far higher charges that INS (1 and 1/4 cpm) and its ILEC owners (8–9 cpm) seek for the use of their networks.

*of unjust enrichment is covered by an express contract, either in the form of a tariff or a reciprocal compensation arrangement, INS cannot state a claim for unjust enrichment under Iowa law.* *Id.* at 694 (emphasis added) (holding also that "the proper treatment of the claim depends on the disposition of INS' other claims"). Thus, INS' unjust enrichment claim necessarily depends on resolution of the reciprocal compensation and tariff issues discussed by the Court above.[89] Accordingly, if the Court had found INS' tariffs valid and applicable, the unjust enrichment claim must be dismissed regardless of whether there remain issues of fact as to the elements of such a claim.

The Court finds, however, that even though the tariffs were determined to not be applicable, INS' unjust enrichment claim as currently stated fails as a matter of law. First, the Court has determined the Board's actions with regard to directing negotiation/arbitration is consistent with federal law and is available to INS. As a result, there is regulatory scheme in place to resolve the issues presented here.[90] Under that framework, INS will be compensated for the traffic it transported over its lines and delivered to end-user customers.

In addition, the Court has also determined that the IUB has validly determined Qwest is not obligated to pay access charges, the compensation being sought. To the extent Qwest might ultimately be required to make some payment to INS after negotiation/arbitration, the amounts cannot now be reasonably determined as neither the Court nor the parties can an-ticipate the involvement of the wireless carriers. In short, because resort to equity is improper where there is a regulatory scheme, INS' unjust enrichment claim is not the proper vehicle for resolution of these issues.

Moreover, the Court finds the Board's determination that Qwest did not receive a benefit belonging to INS is directly in line with federal law and so should be upheld. On the current record, there is no adequate showing that Qwest has retained money that belongs to INS, rather than just charging wireless carriers for access to the Qwest system. At the least, this question is not ripe for consideration until the applicable regulatory process is allowed to proceed. Accordingly, the Court must dismiss the unjust enrichment claim asserted by INS.

## H. Implied Contract/quantum Meruit Claim

While INS' claim for breach of implied contract/quantum meruit relies on many of the same facts as its claims for unjust enrichment, these claims are entirely separate theories of recovery under Iowa law. *See Order on Pending Motions,* at 12 (citing *Iowa Waste Sys., Inc. v. Buchanan County,* 617 N.W.2d 23, 29–31 (Iowa App. 2000) (distinguishing unjust enrichment and quantum meruit claims and stating that "despite the years of inseparably connecting these two terms, the two terms are not only markedly different, but not even rooted in the same legal genre")). INS argues that the Court should allow INS' quantum meruit claim to proceed because

---

**89.** INS acknowledges this, and states that if the Court determines INS' tariffs do not apply, INS seeks compensation through an unjust enrichment claim as "[i]t is not equitable for INS to provide a valuable service to Qwest, but not have the ability to be paid for that service."

**90.** That framework is the section 252 negotiation/arbitration schema as implemented by the FCC and properly employed by the IUB in its decisions.

there exist genuine issues of material fact on this issue.

■ Under Iowa law, a plaintiff claiming the existence of an implied contract must show the following: (1) plaintiff performed under circumstances reasonably indicating the performance was for the benefit of defendant and not another person; (2) plaintiff performed under circumstances reasonably indicating payment was expected; and (3) the services provided by the plaintiff were beneficial to the defendant. *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002); *Iowa Waste Sys., Inc.*, 617 N.W.2d at 28. INS argues that a reasonable trier of fact could find all three elements have been met in the present case. Qwest, on the other hand, contends that summary judgment should be granted on this count as INS is unable to show these elements have been satisfied for at least two reasons.

■ INS contends the first element is satisfied because INS performed under circumstances based on the terms of its tariffs indicating the services were provided for Qwest. A tariff functions as an offer to sell service on the terms specified in the tariff. *Metro E. Ctr. for Conditioning & Health v. Qwest Communications Int'l, Inc.*, 294 F.3d 924, 926 (7th Cir.2002); *Advamtel, LLC v. Sprint Communications Co.*, 105 F.Supp.2d 476, 479 (E.D.Va.2000). According to INS, its tariff makes the carrier directly interconnecting with INS at a point of demarcation the customer responsible for payment.[91] INS maintains that carrier is Qwest.

■ INS argues that after April 1999, Qwest accepted INS' offer to sell service on the terms specified in the tariffs by constructively ordering service[92] and routing commingled calls to INS' networks. INS further contends Qwest expressly accepted INS' offer by submitting written ASRs requesting service. Additionally, INS asserts that Qwest has continued to send commingled traffic to INS' networks, fully aware INS is not technically able to distinguish between the type of call (i.e., wireless- or wireline-originated calls) or from where the calls originated (i.e., by Qwest's end users or end users of third-party carriers), and therefore, INS could not refuse to provide service to this traffic. INS argues that each of these actions by Qwest acted as an acceptance of INS offer to sell the service on the terms specified in the tariffs, and that Qwest reasonably should have understood that INS' provision of that service was for Qwest's benefit.

INS further argues that the circumstances surrounding the parties' relationship indicate the services provided were for Qwest's benefit, and not for the benefit of another person. For Qwest to fulfill its obligations to third-party carriers to transport calls to their ultimate destination, Qwest needed to engage INS' services to route such calls to the appropriate Routing Exchange Carrier ("REC") for

---

**91.** The tariff does provide an exception if the calls are wireless-originated and the directly interconnecting carrier promptly provides information requested by INS to permit INS to accurately bill the original wireless carriers.

**92.** The constructive order doctrine provides that where a party (1) maintains its interconnection to a carrier, (2) fails to take reasonable steps to stop using the services of the carriers, and (3) actually receives the services of the carrier, the party receiving the services is deemed to have ordered them. *See AT & T Communications of the Midwest, Inc. v. Iowa Utils. Bd.*, 687 N.W.2d at 561 (citing *Advamtel, LLC*, 118 F.Supp.2d at 684–87); *AT&T Corp. v. FCC*, 292 F.3d at 812. INS maintains that Qwest satisfies all of the elements of the constructive order doctrine and thus is deemed to have ordered the services from INS for the transport of calls, whether they were wireline-originated or wireless-originated.

termination. INS routes the calls to the appropriate REC, thereby enabling Qwest to fulfill its obligations and then bill and receive payment from the third-party carriers. INS compares the relationship between Qwest and INS to that of a contractor-subcontractor, where the contractor (Qwest) has hired the subcontractor (INS) to enable the contractor to fulfill its contractual obligations. *See K & L Landscape & Constr. Inc. v. Dakota Contractors, Inc.*, 2004 Iowa App. LEXIS 1151, 695 N.W.2d 41 (2004). Under such a relationship, the performance of the subcontractor is principally for the benefit of the contractor.

INS next argues that the second element of an implied contract claim is satisfied because INS provided access service to Qwest under circumstances indicating that INS expected payment.[93] The tariff and its terms, which INS argues Qwest assented to both expressly and constructively, was a matter of public record, and in fact, Qwest was aware of the relevant terms of the tariff. According to INS, the plain language of the tariff provides that Qwest is responsible for payment of wireless-originated calls if it does not provide information necessary for INS to bill the wireless carriers. In addition, INS has consistently invoiced Qwest for all traffic sent to INS, regardless of whether those calls were originated by third-party carriers, and has continued this practice even after Qwest's decision in April 1999 to stop paying for such calls.

Finally, INS contends Qwest cannot deny it received a benefit, thereby meeting the third element of an implied contract. According to INS, Qwest received service from INS that, if it were of no benefit, Qwest could have stopped using at any time. Logically, by not discontinuing use of INS' services, Qwest recognized the benefits it was receiving. The continued use of INS' services allowed Qwest to continue to make money for itself by selling its own services to third-party carriers.

In addition, under quantum meruit/implied contract, the measure of damages is the reasonable and customary value of the services provided. *Scott*, 653 N.W.2d at 562 (citing *Iowa Waste Sys., Inc.*, 617 N.W.2d at 29). This is not limited to the direct monetary gain of the defendant in the transaction. *Id.* In this case, INS asserts the reasonable and customary value of the services provided by INS to Qwest is easily determined by the published tariff rates. On this basis, INS urges the Court to discard Qwest's attempt to minimize the value of the benefit provided by INS by pointing to the small rates Qwest charges the third-party carriers.

Qwest first contends that its April 1999 letter to INS forecloses any finding that there existed an implied-in-fact contract for Qwest to pay for INS' transport of transit traffic. Quantum meruit, or implied contract, is "grounded in the realm of pure contract." *Iowa Waste Sys., Inc.*, 617 N.W.2d at 29. Like any contract, it requires "some overt communication of assent" by the party sought to be charged with the obligation. *Id., see also Cooper v. Lakewood Eng'g & Mfg. Co.*, 45 F.3d 243, 246 (8th Cir.1995) (stating that "like other contracts, an [implied contract] requires a 'meeting of the minds'"). In contrast to an express contract, the assent required to support an implied contract is inferred from "expressions other than words", that is, conduct. *Iowa Waste Sys., Inc.*, 617 N.W.2d at 29. Accordingly, there can be no implied contract where the party

---

**93.** Including payment for services provided after April 1999, when Qwest determined it was not required to make payments to INS and discontinued making any payments for use of INS' networks.

sought to be charged expressly denies, prior to performance by the other party, that such performance would give rise to some obligation on its part. *Id.*

Qwest maintains that this proposition is fatal to INS' claim. It is undisputed that Qwest expressly advised INS in April 1999 that Qwest did not assent to pay for the transport by INS of calls placed by subscribers of third-party carriers. Qwest asserts that "[s]uch a declaration of dissent flies squarely in the face if an implied-in-fact contract for provided services." *Id.* at 30. In addition, Qwest contends that INS' argument that it did not perform its services "gratuitously" misses the point that Qwest did not and should not have understood INS was entitled to compensation from Qwest for calls placed by subscribers of other carriers, especially after Qwest's declaration to the contrary.

Qwest next argues that INS cannot establish that Qwest understood or should have reasonably understood that the transport of transit traffic was performed for and was beneficial to Qwest as opposed to the wireless carriers. To prevail, INS must establish that Qwest, the alleged recipient of transport provided by INS, should have understood that INS' transport of calls placed by subscribers of third-party wireless carriers was performed for and beneficial to Qwest. *See id.* Qwest contends that any finding to this effect is foreclosed for the following:

(1) the amount of compensation received by Qwest from the wireless carriers (i.e., 1/4 cent per minute) relative to the amount of compensation demanded from Qwest by INS (i.e., 1.14 cents per minute) for the same calls;

(2) the provisions in the agreements between Qwest and the wireless carriers pursuant to which the latter acknowledged that Qwest was not responsible

for transport by INS or any other carrier, and that the wireless carriers were responsible for any compensation owed to INS for the transport of calls placed by their subscribers;

(3) the conspicuous absence of disagreement by AT & T Wireless, Verizon Wireless, Sprint or any other wireless carriers participating in the Board's proceeding that they, not Qwest, were responsible for any compensation owed to INS;

(4) the Board's determination that the wireless carriers, not Qwest, had used INS' facilities, and that they, not Qwest, should compensate INS;[94] and

(5) agreements negotiated by INS with wireless carriers subsequent to the Board's proceeding.

Qwest contends that this Court has already held that the "true beneficiaries of INS' service" are the Independent LEC's (INS' owners) and their customers and the wireless carriers and their customers, as the Independent LEC's customers can receive wireless calls made by customers of the third-party wireless carriers. *INS v. Qwest I,* 2002 WL 31296324, at *15–16. Qwest asserts that finding is wholly unaffected by the Eighth Circuit's decision on appeal, *INS v. Qwest II,* 363 F.3d at 694, and that it requires the entry of summary judgment in Qwest's favor.

In addition, Qwest argues that the FCC decisions on intercarrier compensation generally, and transiting in particular, confirm the parties could not have reasonably understood that INS' transport in this case was performed for and beneficial to Qwest rather than the third-party wireless carriers that originated the calls. According to Qwest, the FCC's intercarrier compensation policy and rules "require the *calling party's carrier,* whether LEC, IXC or CMRS, to compensate the called party's

---

**94.** *IUB Order Affirming Proposed Decision,* at 2.

carrier for terminating the call." *See Intercarrier Compensation NPRM*, 1996 WL 452885, 11 FCC Rcd. at ¶ 6 (emphasis added).[95] Such "interconnection regimes," referred to in the industry and by regulators as "calling party network pays", or CPNP, are "clearly the dominant form of interconnection regulation in the United States and abroad." [96] *Id.*

In *Texcom Inc. v. Bell Atlantic Corp.*, the FCC specifically applied CPNP to situations where the transit carrier has no relationship with the end-user customers placing or receiving the calls, holding that such transit carriers should not bear the burden of transporting traffic between third-party CMRS providers and LECs. *Texcom Order*, 2001 WL 1504282, at * 2, 16 FCC Rcd. at ¶ 6. The FCC stated in relevant part,

> Currently, our rules in this area follow the cost causation principle of allocating the cost of delivering traffic to the carriers responsible for the traffic, and ultimately their customers. Thus, through reciprocal compensation payments, the cost of delivering LEC-originated traffic is borne by the persons responsible for those calls, the LEC's customers. As we stated in the *Local Competition Order*, '[t]he local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call.' . . . In the case of third-party originated traffic, however, the only relationship between the LEC's customers and the

call is the fact that the call traverses the LEC's network on its way to the terminating carrier. Where the LEC's customers do not generate the traffic at issue, those customers should not bear the cost of delivering that traffic from a CLEC's network to that of a CMRS carrier like Answer Indiana. Thus, the originating third-party carrier's customers pay for the cost of delivering their calls to the LEC, while the terminating CMRS carrier's customers pay for the cost of transporting that traffic from the LEC's network to their network.

*Id.* In addition, the FCC's Wireless Competition Bureau applied these principles to reject the claim that local calls placed by subscribers of third-party carriers should be treated as the transit carrier's "own" traffic and that the transit carrier should be required to compensate the carrier to which it delivers the third-party traffic. *Verizon Virginia Order*, at *154, 17 FCC Rcd. at ¶ 541. The Bureau determined that the carrier to which the transiting carrier delivered the traffic should bill the originating carrier directly. *Id.* at *155, 17 FCC Rcd. at ¶ 544.

Qwest also asserts that every federal court and state commission to consider the issue has held that Qwest, as a transit carrier, is not liable for "access charges" or other compensation "on [third-party] CMRS traffic that both originates and terminated in the same MTA" and transits Qwest's facilities. *See, e.g., 3 Rivers Tel. Coop. v. U.S. West*, 2003 U.S. Dist. LEXIS

---

**95.** INS attempts to distinguish the FCC's statements on the ground that they apply solely to termination of calls by its owners, the Iowa Independent LEC's, and not on INS. According to Qwest, this argument is flawed because INS ignores the CPNP ("calling party network pays") and its underlying cost causation principles require focus not on the obligee (i.e., the carrier entitled to compensation), but on the obligor (i.e., the carrier which must pay compensation).

**96.** The form of interconnection regulation other than CPNP, "bill and keep", means that interconnected carriers seek all monetary compensation form their end-user customers and forego compensating one another for their transport of calls placed between those customers. *See* 47 U.S.C. § 252(d)(2)(b)(i); *Intercarrier Compensation NPRM*, 1996 WL 452885, 11 FCC Rcd. at ¶ 6.

24871, at \*68–69 (D.Mt.2003) (rejecting monetary compensation under tariff and unjust enrichment claims); *accord. Union Tel. Co. v. Qwest Corp.,* slip op., No. 02 CV 209B, at 26, 34 (D.Wyo. May 11, 2004) (same). Qwest maintains that this holding is especially cogent in the present matter as the Board found "the vast majority of traffic at issue" is intraMTA, *IUB Proposed Decision,* at 21, and the FCC has defined intraMTA wireless originated traffic as local traffic. *See INS v. Qwest I,* 2002 WL 31296324, at \*3.

Finally, Qwest contends that the "constructive order" cases cited by INS actually undermine INS' argument that Qwest was a party to an implied contract to pay 1.14 cents per minute or some other amount for INS' transport of calls placed by subscribers of third-party wireless carriers.[97] In the cases cited by INS, the defendant carrier found liable under the constructive order doctrine was an IXC (i.e., long distance carrier) that provided end-to-end service to, and had a billing relationship with the callers. *See Advamtel, LLC,* 118 F.Supp.2d at 681, 682; *Advamtel LLC v. Sprint Communications Co.,* 105 F.Supp.2d 476, 478, 479 (E.D.Va. 2000); Final Decision and Order, *Fibercomm, L.C. et. al. v. AT&T Communications of Midwest, Inc.,* Docket No. FCU–00–3, at 10, 29, 2001 WL 1564019 (Iowa Utils.Bd. Oct. 25, 2001), *aff'd, AT & T Communications of the Midwest, Inc. v. Iowa Utils. Bd.,* 687 N.W.2d 554 (Iowa Sept. 15, 2004).

In stark contrast, Qwest asserts in the present case that it was "merely an intermediary", *INS v. Qwest II,* 363 F.3d at 694 n. 3, providing "an indirect connection for local traffic." *IUB Proposed Decision,* at 13. Qwest had no billing relationship with the callers, nor did it provide the callers or

their wireless carriers with an end-to-end service that included transport by INS and/or termination by the Iowa Independent LEC's. *See id.* Additionally, in contrast to INS' cited cases where no party even claimed the plaintiffs had recourse against other carriers, here INS is entitled to compensation from the wireless carriers.

In reply, INS contends Qwest's self-serving April 1999 letter does not excuse it from liability for its later action in actually using INS' service, an outcome rejected by the FCC. *See MGC Communications v. AT & T,* 1999 WL 503598, 14 FCC Rcd. 11647 (1999). Despite its letter, Qwest continued to use INS' services in the transport of wireless calls.

In *MGC Communications,* the defendant purchased services provided by the plaintiff pursuant to its federal tariff. *Id.* The defendant later wrote a letter to the plaintiff for the purpose of terminating their arrangement for originating access service, and the defendant subsequently stopped paying for such service. *Id.* Despite this, the FCC ruled the defendant was liable to the plaintiff for access services because the defendant had not taken sufficient steps to terminate its access service arrangement with the plaintiff. *Id.* After writing the letter, the defendant continued to accept new subscribers from the plaintiff and did not migrate customers to another carrier. *Id.*

INS maintains Qwest placed Access Service Requests ("ASR's") for INS' services while knowing the INS trunks being used by Qwest are designed to carry only long distance calls and that INS expected payment for Qwest's use of the network and continued to bill Qwest for such use. Qwest was aware INS could not distinguish between wireless and wireline-origi-

---

97. Though not relevant to this motion, Qwest sharply disputes that the "reasonable value" of INS' transport of the calls at issue should be measured by INS' unilaterally filed tariffs, especially considering the vast majority of calls at issue are local.

nated calls in the commingled traffic, or whether the calls came from Qwest's customers or from the customers of some third-party. As a result, INS was unable to refuse to provide service for the calls which Qwest refused to pay.

Moreover, Qwest refused to implement INS' suggestion that Qwest send calls from wireless carriers to INS over separate dedicated trunks, failed to provide information INS requests to facilitate billing originating wireless carriers, and attempted to charge INS for the records it did belatedly provide.[98] In short, Qwest acted voluntarily in continuing to place calls on INS' network. *See INS v. Qwest II*, 363 F.3d at 694 n. 3. INS asserts that Qwest's continued use of INS' services constitutes the assent necessary for quantum meruit and "speak louder" than the April 1999 letter, and that Qwest should be held liable for this affirmative action. *See Roger's Backhoe Serv. v. Nichols*, 681 N.W.2d 647, 651 (Iowa 2004).

INS further counters Qwest's arguments by asserting that its contracts with third parties cannot insulate Qwest from liability. Specifically, INS maintains that it was not a party to Qwest's agreements with any third-party wireless carrier, and that Qwest cannot through a contract with a third party allocate responsibility for paying INS without INS' consent, nor can these parties agree who is receiving the benefit of INS' services.[99]

INS further contends that the CPNP regime referenced by Qwest, wherein transiting carriers are exempt from paying for services of other carriers in the calling path, does not protect Qwest from liability as no such regulatory scheme exists. INS points out that the FCC proceeding cited by Qwest in support of CPNP is merely a proposal for rulemaking and not a final implementing order, *see Intercarrier Compensation NPRM*, 1996 WL 452885, 11 FCC Rcd. at ¶ 6, and that existing rules do not require CPNP. *See In the Matter of Access Charge Reform, Eighth Report and Order*, 2004 WL 1103977, at *6, 19 FCC Rcd. 9108, at ¶ 18 (2004).

Indeed, the FCC's Wireline Communication Bureaus ordered a transiting carrier, rather than the calling party's carrier, to pay access charges to a terminating carrier where the transiting carrier failed to pass on available information that would allow the terminating carrier to bill the originating carriers.[100] *Cavalier*, 2003 WL 22939121, 18 FCC Rcd. 25887. In addition, a sister district court recently rejected Qwest's CPNP argument because of tariff language that made the party directly delivering the calls liable and the historic practice under which Qwest for many years paid for all the calls it delivered, regardless of origin. *See 3 Rivers Tel Coop., Inc. v. U.S. West Communications, Inc.*, 2003 U.S. Dist. LEXIS 24871, *19, *41–43 (D.Mont.2003).[101] Finally, INS as-

---

**98.** INS further notes that the wireless carriers have questioned the accuracy of the records provided by Qwest.

**99.** In a footnote, INS posits that "[h]ad the 8th Circuit agreed that Qwest received no benefit as a matter of law, it would not have reinstated the unjust enrichment count, of which benefit is an element." This is an overly generous use of the finding of the Circuit, which while reinstating the unjust enrichment count, did not reach the specific holding INS argues. Instead, the Circuit left

the issue open "as the proper treatment of the claim depends on the disposition of INS's other claims." *INS v. Qwest II*, 363 F.3d at 695.

**100.** Recently several wireless carriers have agreed to directly connect with INS without Qwest's involvement, thereby solving on a going forward basis the billing/measurement problems posed by Qwest's commingling of calls.

**101.** *3 Rivers* involved terminating carriers relying on a *state* tariff that the court found was

serts that the reciprocal compensation cases cited by Qwest do not support Qwest's CPNP argument because reciprocal compensation only applies to local calls, not long distance or interexchange calls, and that reciprocal compensation does not govern transiting charges. *See Texcom Reconsideration Order*, at \*2, 17 FCC Rcd. at ¶ 4; *see also* 47 C.F.R. § 51.701(e) (providing that the terminating carrier bills the originating carrier in a reciprocal compensation arrangement).

The Court finds that INS' implied contract/quantum meruit claim fails for many of the same reasons its unjust enrichment claim fails. Foremost, an equitable remedy is unavailable where there is a regulatory scheme in place such as that present here. Additionally, INS has not made an adequate showing on the current record that the elements of an implied contract were met.

Moreover, the Board determined that Qwest was not liable for access charges for its transport and delivery of the calls to INS and this holding has been found by the Court to be consistent with federal law. Thus, INS cannot be granted compensation already determined unavailable through resort to a claim of implied contract. Finally, once Qwest wrote and delivered the April 1999 letter laying out its determination it no longer was required to pay INS, then Qwest could not be found to be performing under the expectation that it would be required to pay INS and INS could not be expected to reasonably believe payment would be forthcoming. Also, since the Court has determined there is no applicable tariff, INS cannot use the terms of the tariff to demonstrate it was acting with the reasonable expectation of receiving payment. In so finding, the Court again notes there may be underlying issues that are simply not ripe for consideration.

## CONCLUSION

For the foregoing reasons, the Court resolves the issues presented in the parties' initial briefs and hereby **grants** Qwest's motion for summary judgment (Clerk's Nos. 50, 54). The Court finds the IUB had jurisdiction to rule in the underlying action and was acting within its authority in rendering its rulings. The Court further finds the determinations made by the IUB in its rulings are consistent with, and do not violate, federal law. As a result, the Court holds the Board's orders must be upheld as a regulatory means of resolving the dispute.

The Court next finds INS' Amended Federal Tariff does not apply to the traffic at issue as it undermines the thrust of the Act and the authority of the IUB. Additionally, the Court finds the Iowa tariff and the original federal tariff inapplicable under the terms of the 1996 Act and the Board's rulings. These determinations also necessarily foreclose Defendant's self-help claim.

Having made these findings, the Court must also hold that the equitable remedies do not lie. The Court finds that a regulatory scheme is available to the parties as indicated by the Board's decisions, and the parties must adhere to this framework before equitable remedies may be ripe for consideration. In addition, the unjust enrichment and implied contract/quantum meruit claims fail on the current record for assorted substantive deficiencies as discussed above.

Qwest's motion for summary judgment (Clerk's Nos. 50, 54) must be granted.

---

preempted, a situation not present in this case as preemption is inapplicable to the *federal*

tariff at issue here.

The case is dismissed, and the Clerk of Court is directed to enter Judgment in favor of the Defendant and against the Plaintiff.

**IT IS SO ORDERED.**